HOWARD SKAIST, ESQ.
OREGON STATE BAR NO. 883482
EMAIL: hskaist@bltg-ip.com
BERKELEY LAW AND TECHNOLOGY GROUP, LLP
17933 EVERGREEN PARKWAY, SUITE 250
BEAVERTON, OR 97006-7660
TELEPHONE: 503-439-6500
FACSIMILE: 503-439-6558

FILED '08 AUG 14 11:32 USDC-ORP

ATTORNEYS FOR PLAINTIFFS MELLAND GROUP, LLC
AND ALLAIN DE LA MOTTE

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| MELLAND GROUP, LLC d/b/a nTRUST,<br>        an Oregon limited liability company, and<br>ALLAIN DE LA MOTTE, an individual,<br><br>                    PLAINTIFFS<br><br>v.<br><br>BERND H. WEBER,<br>CLAUDE J. CHAUVEAU,<br>AMERICAN GULF FINANCE CORP.,<br>ALVION PARTNERS, LLC,<br>WEBER, LLC,<br>AGF REALTY SOLUTIONS, INC.,<br>ALEXON HOLDINGS INTERNATIONAL,<br>LTD.,<br>TIMEDATA CORPORATION,<br>TIME DATA HOLDINGS, LLC, and<br>DOES 1-10,<br><br>                    DEFENDANTS | CASE NO.<br><br>CV'08 - 957 - AC<br><br>COMPLAINT for<br>Trademark Infringement<br> (Lanham Act 43 (A))<br>Trade Secret Misappropriation<br>Fraud<br>Breach of Contract<br>Breach of Fiduciary Duty<br>Interference with Business Relationships<br>Breach of Duty of Good Faith and Fair<br>Dealing<br>Conversion<br>Civil Conspiracy<br>Unjust Enrichment<br><br><br>DEMAND FOR JURY TRIAL |

22586

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiffs Melland Group, LLC ("Melland") and Allain de la Motte ("de la Motte") (together, the "Plaintiffs") complain of the actions of Defendants Bernd H. Weber ("Weber"), Claude J. Chauveau ("Chauveau"), American Gulf Finance Corp. ("American Gulf"), Alvion Partners, LLC ("Alvion Partners"), Weber, LLC, AGF Realty Solutions, Inc. (AGF Realty"), Alexon Holdings International, Ltd. ("Alexon"), TimeData Corporation, Time Data Holdings, LLC and Does 1-10 (collectively, the "Defendants"), and respectfully show the following:

## INTRODUCTION

1.      Plaintiffs bring this case to redress Defendants' wrongful and unauthorized theft, abstraction, use, disclosure, dissemination, licensing and/or sale of Plaintiffs' trade secrets and intellectual property including, without limitation, certain financial technology developed, owned and/or licensed by Plaintiffs. Plaintiffs seek actual damages, punitive damages, treble damages, attorneys' fees, expenses and costs. More important, Plaintiffs seek an injunction against Defendants to prevent such wrongful and unauthorized actions permanently.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over Plaintiffs' claims under (i) 15 U.S.C. §1125 pursuant to 15 U.S.C. §1121 (Lanham Act); (ii) 28 U.S.C. § 1332(a) (diversity); (iii) 28 U.S.C. § 1331 (federal question); and (iv) 28 U.S.C. § 1367 (supplemental jurisdiction).

3.      This Court also has *in personam* jurisdiction over Defendants because Defendants were (and continue to be) members of a conspiracy, one or more of Defendants committed a substantial tortious act in the State of Oregon in furtherance of the conspiracy and/or one or more of Defendants resided, worked, maintained citizenship, was organized and/or conducted business in the State of Oregon.

4.      At all relevant times, one or more of the Defendants resided, worked, maintained citizenship, was organized and/or conducted business in the District of Oregon. A substantial part of Defendants' wrongful acts and omissions occurred in the District of Oregon. Accordingly, venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5.      Plaintiff Melland d/b/a nTrust is an Oregon limited liability company with its principal place of business at 6700 SW Sandburg Road, Tigard, Oregon 97223.

6.      Plaintiff de la Motte is a resident of Hillsboro, Oregon.

7.   Defendant Weber is a German citizen and resident of Mississauga, Ontario. Weber formerly was the Senior Vice-President, Project Development of Melland.   In that capacity, Weber had unrestricted access to the Confidential Technology and other intellectual property assets owned by Plaintiffs.   Weber also managed, operated and treated Defendants American Gulf, Alvion Partners, Weber, LLC, AGF Realty and Alexon as his personal bank accounts (and continues to do so) in such a way that these entities are his alter egos because in such entities, corporate formalities are not followed, separate and distinct books and records are not maintained and/or they are undercapitalized.   On information and belief, Weber may be served with Summons and a copy of the Complaint by serving him at 55 Kingsbridge Garden Circle, Suite 702, Mississauga, Ontario Canada L5R 1Y1, his residence and principal place of business.

8.      Defendant Chauveau is a citizen and resident of Portland, Oregon and New York, New York.  Chauveau formerly was the Chief Information Officer of Melland.  In that capacity, Chauveau had unrestricted access to the Confidential Technology and other intellectual property assets owned by Plaintiffs.  Chauveau also managed, operated and treated Defendants TimeData

Corporation and Time Data Holdings, LLC as his personal bank accounts (and continues to do so) in such a way that these entities are his alter egos because in such entities, corporate formalities are not followed, separate and distinct books and records are not maintained and/or they are undercapitalized. Chauveau also is a Director of Defendant Alvion Partners, which is wholly-owned and controlled by Weber. Chauveau may be served with Summons and a copy of the Complaint by serving him at 333 NW 9th Avenue, No. 411, Portland, Oregon 97209 or 447 West 56th Street, New York, New York 10019, his residences and/or principal places of business.

     **9.**     Defendant American Gulf is a corporation organized under the laws of St. Vincent and the Grenadines. American Gulf is wholly-owned and controlled by Weber. American Gulf also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account. American Gulf may be served with Summons and a copy of the Complaint by serving any officer or registered representative at P.O. Box 613, Kingstown, St. Vincent & the Grenadines or c/o Weber, Krapp & Kollegen, Steuerberatungsgesellschaft mbH, Bahnhofstrasse 18, D-59929, Brilon, Germany.

     **10.**     Defendant Alvion Partners is a limited liability company organized under the laws of the State of Delaware. Alvion Partners is wholly-owned and controlled by Weber. Alvion Partners also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account. Defendant Chauveau is a Director of Alvion Partners. Alvion Partners may be served with Summons and a copy of the Complaint by serving Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, its registered agent for service of process.

11.    Defendant Weber, LLC is a limited liability company organized under the laws of the State of Delaware.  Weber, LLC is wholly-owned and controlled by Weber. Weber, LLC also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account.  Weber, LLC may be served with Summons and a copy of the Complaint by serving Incorporating Services, Ltd., 3500 South Dupont Highway, Dover, Delaware 19901, its registered agent for service of process.

12.    Defendant AGF Realty is a limited liability company organized under the laws of the State of Delaware.  AGF Realty is wholly-owned and controlled by Weber. AGF Realty also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account.  AGF Realty may be served with Summons and a copy of the Complaint by serving registered Agents Legal Services, LLC, 1220 N. Market Street, Suite 806, Wilmington, Delaware 19801, its registered agent for service of process.

13.    Defendant Alexon is a wholly-owned and controlled by Weber. Alexon also is the alter ego of Weber in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Weber uses it as his personal bank account.

14.    Defendant TimeData Corporation is a corporation organized under the laws of the State of Delaware.  TimeData Corporation is 70% owned and controlled by Chauveau, its founder and CEO.  TimeData Corporation also is the alter ego of Chauveau in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Chauveau uses it as his personal bank account.  TimeData Corporation

may be served with Summons and a copy of the Complaint by serving any officer or registered representative—including Chauveau, its President and CEO—at 447 West 56th Street (1st Floor), New York, New York 10019, its principal place of business, or by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, its registered agent for service of process.

     **15.**     Defendant Time Data Holdings, LLC is a limited liability company organized under the laws of the State of Delaware. Time Data Holdings, LLC is owned and controlled by Chauveau, its founder and CEO. Time Data Holdings, LLC also is the alter ego of Chauveau in that corporate formalities are not followed, separate and distinct books and records are not maintained, it is undercapitalized and/or Chauveau uses it as his personal bank account. Time Data Holdings, LLC may be served with Summons and a copy of the Complaint by serving any officer or registered representative—including Chauveau, its President and CEO—at 447 West 56th Street (1st Floor), New York, New York 10019, its principal place of business, or by serving Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, its registered agent for service of process.

     **16.**     Defendants TimeData Corporation and Time Data Holdings, LLC together will be referred to as "TimeData."

     **17.**     The Doe Defendants, at the very least, knowingly aided and abetted, knowingly participated in and/or conspired to participate in the named Defendants' wrongful actions, as described in greater detail below. The identities of the Doe Defendants are not known by the Plaintiffs at this time. Once the Doe Defendants are identified during the discovery process, Plaintiffs will seek leave of Court to add them as named Defendants.

**18.**    All of the Defendants' wrongful actions described herein were committed (and continue to be committed) by Weber and/or Chauveau, individually and/or by and/or through (and/or in concert with) each other, the Doe Defendants, third-party non-Defendants and/or Defendants American Gulf, Alvion Partners, Weber, LLC, AGF Realty, Alexon and/or TimeData.

## BACKGROUND FACTS

**19.**    Melland d/b/a nTrust provides financial consulting services.  Melland is the exclusive United States licensee of a substantial portfolio of financial-based intellectual property, including pending patent applications (United States, foreign and international) that it acquired from de la Motte, their inventor.  Melland also owns and safeguards trade secret information, including drawings, cost data, customer lists, formulas, patterns, compilations, programs, devices, methods, techniques, processes, know-how, information about customer particularities and preferences, pricing and margin information. The pending patent applications and above trade secret information collectively will be referred to as the "Confidential Technology." Among other things, the Confidential Technology offers novel and innovative financial structures, strategies and products to banks, financial institutions, companies seeking innovative financing and the investment community at large.

**20.**    The Confidential Technology includes five (5) broad patent families encompassing over 1000 original claims that, in turn, are likely to result in dozens of individual patents being issued to de la Motte, the inventor.  The Confidential Technology includes, but is not limited to:

(i)    "Trust-Linked Banking" technology incorporating a debit card product that pays a trust dividend on investments held in trust *(e.g.*, the 'Trust-Linked Debit Card");

(ii)    ICEF (institutional capital enhancement funding technology); and

(iii)    various other finance-related or profit generation activities, pending patents, trade
secrets and proprietary systems, methods and processes.

**21.**    During the week of April 9, 2007, Melland appointed Chauveau its Chief
Information Officer.  Prior to that, Chauveau, on April 27, 2006, executed a Confidentiality,
Non-Disclosure and Non-Utilization Agreement (the "CNDA") with Melland, which also was
applicable to Chauveau's appointment, and pursuant to which Chauveau agreed, among other
things, to:

(i)     maintain the confidentiality of the Confidential Technology and limit its
disclosure;

(ii)    not duplicate and/or distribute the Confidential Technology for any purpose other
than Melland's legitimate business purposes; and/or

(iii)   not use, discuss and/or disclose the Confidential Technology for <u>any</u> purpose
without prior written approval of Melland.

**22.**    During December 2006, Weber, who represented to Plaintiffs that he was the
exclusive agent and representative of Alvion Properties, Inc., a legitimate coal concern based in
Harrisburg, Illinois that is completely unrelated to Defendant Alvion Properties, approached
Plaintiffs to inquire about licensing all or a portion of the Confidential Technology.  As a
condition of licensing the Confidential Technology, Weber, on December 27, 2006, and
ostensibly on behalf of Alvion Properties, Inc., executed a CNDA with Melland containing the
same non-disclosure restrictions contained in the CNDA executed by Chauveau.

**23.**    Pursuant to the executed CNDAs, Plaintiffs commenced disclosing, in detail to
Chauveau and Weber, the intricacies and nuances of the Confidential Technology.

**24.**    In addition to serving as the Melland CIO, Chauveau also owned and operated
TimeData, a company that owns and licenses financial time stamping technology (and continues

to do so). Based on their personal and business relationships with Chauveau, including his executed CNDA, Plaintiffs, in February 2007, agreed to assist Chauveau with capitalizing TimeData by utilizing a portion of the Confidential Technology. In that regard, on February 12, 2007, Paul Toldalagi, President and COO of TimeData, executed a CNDA with Melland on behalf of TimeData that contains the same non-disclosure restrictions contained in the CNDAs executed by Chauveau and Weber. Pursuant to the executed CNDA, Plaintiffs commenced disclosing, in detail to TimeData and its employees, the intricacies and nuances of the Confidential Technology.

25.     During early May 2007, de la Motte and Robert M. West ("West"), President of Melland, travelled to New York to meet with several potential licensees of the Confidential Technology. West and de la Motte stayed with Chauveau at Chauveau's combination office/condo in Brooklyn, during which time they spent many hours with Chauveau further explaining the Confidential Technology in greater detail. For example, and among other things, West and de la Motte shared with Chauveau multiple Excel spreadsheets containing voluminous information pertaining to different aspects of the Confidential Technology contained in multiple patent filings.

26.     The week of August 13-17, 2007, Thomas L. Estes ("Estes"), then acting Chief Investment Officer of Melland, and de la Motte travelled to New York and, along with Chauveau, met with several potential licensees of the Confidential Technology, including the Bank of New York Mellon ("BNY Mellon") and MasterCard. During this trip, de la Motte and Chauveau discussed the feasibility of Chauveau obtaining a limited use license of a portion of the Confidential Technology (known as the "card game technology") to assist TimeData with

generating badly needed funding.  During these discussions, de la Motte revealed to Chauveau further details about the Confidential Technology and how it functions.

28.    On September 1, 2007, Weber travelled to Melland's corporate offices in Portland, Oregon to meet with Plaintiffs to further learn about the Confidential Technology and its application in the marketplace, including its application to Alvion Properties, Inc.'s financial situation.  Pursuant to the CNDA executed by Weber on behalf of Alvion Properties, Inc., Plaintiffs continued to disclose to Weber, in detail, the intricacies and nuances of the Confidential Technology.

28.    After participating in multiple in-depth meetings and conferences with Plaintiffs to learn about the Confidential Technology, Weber, in November 2007, represented to Plaintiffs that Alvion Properties, Inc. was prepared to move forward with licensing and implementing the Confidential Technology.  Accordingly, on November 7, 2007, Melland and Alvion Properties, Inc. entered into a Consulting Agreement, pursuant to which Melland ("Consultant") agreed to implement the Confidential Technology for Alvion Properties, Inc. ("Company").    This agreement also may be referred to as the "Alvion Coal Deal."

29.    Weber executed the Consulting Agreement on behalf of Alvion Properties, Inc. as its Chief Financial Officer.  The Consulting Agreement contains non-disclosure restrictions similar to the restrictions contained in the CNDAs executed by Chauveau, Weber (on behalf of Alvion Properties, Inc.), TimeData and Weber (on behalf of American Gulf), but also includes the following specific additional confidentiality language regarding the ownership of any new technologies and/or applications that might result from the efforts of Melland ("Consultant") on behalf of Alvion Properties, Inc. ("Company"):

> Neither this Agreement nor the transfer of any information, ideas, concepts, structures, term sheets, white papers, solutions, methods, products or system to

the Company pursuant to the services provided by Consultant under this Agreement with respect of the New Business Models, shall be construed as granting by implication, estoppel, or otherwise, any rights to Consultant's Technology and or Consultant's rights to any new intellectual property. *It is expressly agreed that any new ideas, concepts and/or strategies developed by Consultant during the course of providing services to the Company under this Agreement ("New Technology") shall remain the exclusive property of Allain de la Motte and/or Consultant as the case may be.* Company hereby waives any rights or interest in any New Technology."

*Id.* at 3 (emphasis added).

30.     As a result of these meetings, Weber also represented to Plaintiffs that he could organize several Confidential Technology licensing agreements with various companies and financial institutions based on his contacts in worldwide financial markets. In that he fashioned himself a "free agent" in the financial marketplace, Weber suggested the best way for him to go about securing additional licensing agreements was for Melland to bestow on him a title. Based on Weber's representations, Melland appointed Weber Senior Vice-President, Project Development. As a condition of receiving this appointment, Weber, on October 29, 2007, executed a second CNDA with Melland—this time on behalf of American Gulf, Weber's wholly-owned company. The CNDA contains the same non-disclosure restrictions contained in the CNDAs executed by Chauveau, Weber (on behalf of Alvion Properties, Inc.) and TimeData.

31.     On November 26, 2007, de la Motte, West, Weber and Estes traveled to New York for two weeks of meetings, the principal purpose of which was to engage BNY Mellon to (i) serve as the trustee for Alvion Properties, Inc.'s coal assets as part of implementing the Confidential Technology, and (ii) provide or, alternatively, syndicate with other banks a credit facility against the coal assets.

32.     While in New York, on or about December 3, 2007, Weber's computer crashed. Chauveau offered to fix it. For several days, Chauveau and Weber worked together on the

computer at Chauveau's office while de la Motte, West and Estes attended the meetings. While working on the computer, Weber and Chauveau had ample time to privately discuss and plot how they could steal, market, license and/or implement the Confidential Technology for their benefit, rather than on behalf of Plaintiffs. The end result of their discussions was an agreement and scheme to work together—through their various and myriad wholly-owned companies (*i.e.*, the entity Defendants)—to do so.

33.     From December 4-8, 2007, and as part of their scheme to misappropriate the Confidential Technology, Chauveau and Weber engaged de la Motte in numerous in depth discussions to further learn about de la Motte's ideas for implementing the Confidential Technology as a partial solution to the liquidity crisis in the United States and globally. During the discussions, de la Motte revealed to Chauveau and Weber additional intricacies and nuances of the Confidential Technology. Out of these discussions was borne the concept of an institutional capital enhancement funding ("ICEF") program utilizing a derivative of the Confidential Technology, which was protected at the time by five (5) non-disclosure agreements executed by Chauveau and Weber (and/or their companies and principals).

34.     The ICEF Program is a financial product designed to assist banks and other financial institutions with increasing their Tier II capital base and, in the process, increase shareholder value. De la Motte created the initial working document with contributions by Chauveau and Weber based upon the Confidential Technology.

35.     In early January 2008, Melland initiated discussions with representatives of Deloitte and Touche, LLP ("Deloitte") in New York to explore a consultancy with Deloitte regarding "banking and accounting regulations" relating to the ICEF Program. Melland and Deloitte ultimately executed a CNDA after several weeks of negotiations. During February

2008, Weber and Chauveau secretly attempted to leverage the Melland/Deloitte relationship by seeking funds from the Alvion Properties' owners to secure a Deloitte opinion and endorsement of the ICEF Program that they, in turn, could use in their Confidential Technology marketing efforts.

      **36.**    On January 18, 2008, Plaintiffs learned that on or about December 19, 2007, while supposedly working on the "Alvion Coal Deal," Weber, without Plaintiffs' knowledge, surreptitiously obtained an executed CNDA from Commerce Bancorp in Cherry Hill, New Jersey by falsely representing to Commerce Bancorp in a letter that Defendants AGF Realty and Alvion Partners—two of Weber's wholly-owned companies—had a license to the Confidential Technology:

> As we believe *our* proprietary funding strategies can bring significant financial benefit and advantage to your institutions, we have chosen to be very selective with respect to the financial institutions we are negotiating with regarding *our* financial engineering technologies.

(emphasis added). Weber engaged in this scheme to defraud Plaintiffs and Commerce Bancorp in direct contravention of the confidentiality agreements he executed with Melland and despite the fact that in a December 21, 2007 Skype message to Chauveau and de la Motte, Weber stated that:

> Claude I am preparing a complete new presentation/concept/approach for Commerce. This presentation, in cooperation with Allain, will then be mirrored for KeyBank. The presentation is made by AGF as the existing account holder, but the presentation will carry the logo of nTrust *and I would like to be in a position to truthfully state that this presentation is made under license of Melland/nTrust.*

(emphasis added).

      **37.**    To add insult to injury, the CNDA executed by Commerce Bancorp and Defendants AGF Realty and Alvion Partners—a confusingly similar name to Alvion Properties,

Inc. by design—was the Melland CNDA form previously executed by Weber on multiple occasions, but devoid of any references to de la Motte and/or Melland, the true owners of the Confidential Technology.

38.    At the same time Defendants were out in the financial markets attempting to license the Confidential Technology on their own and despite their roles as officers of Melland, Chauveau and Weber engaged de la Motte and West (on behalf of Melland) in discussions to form a joint venture—the cornerstone of which was to be the Confidential Technology— ostensibly to legitimize their actions.    On or about January 21, 2008, Chauveau and Weber delivered to de la Motte and West a document, entitled "BrainTrust" Financial Centre (BFC) L.L.C.," which outlined the proposed partnership between the four parties.    Inherent in the proposal was the requirement that de la Motte assign the Confidential Technology to the new venture, thereby effectively conferring 1/3 ownership interest each in the Confidential Technology to Chauveau and Weber.

39.    Unintentionally left in the "properties" of this Microsoft Word document was the following message from Weber to Chauveau: "[t]he creativity braintrust centre to make money off the 'patents' is in Toronto and NYC - so, let's work hard my friend - I am taking a break now and cook for Monda, I had my 9 hours already - therefore, I would suggest you give it a shot first and we get..." This secret message underscores that Defendants will stop at nothing to separate Plaintiffs from the Confidential Technology in order to gain control of it for their own financial benefit.

40.    Immediately thereafter, on January 22, 2008, on the phone and in writing, de la Motte made it clear to Weber and Chauveau that he would not assign his patents and/or pending patent applications on the Confidential Technology to the new venture.    At that point, Chauveau

and Weber stated their intention to take the Confidential Technology outright and "go it alone" without Plaintiffs. As a result, the parties' negotiations to form a separate venture ceased.

**41.**    That very day, January 22, 2008, and consistent with their threats and stated intentions, Weber and Chauveau secretly emailed to Brad Henshaw, Senior Vice President of Farmer's State Bank in Harrisburg, Illinois, a portion of the ICEF Program, thereby misappropriating the Confidential Technology and disclosing it without authorization in violation of their individual CNDAs and the Consulting Agreement.

**42.**    On February 7, 2008, Chauveau and Weber called a meeting with Seward & Kissell, Melland's law firm in New York. During the meeting, Chauveau and Weber announced that they were unilaterally ending their business relationship with Melland.

**43.**    Thereafter, on February 11, 2008, de la Motte sent individual letters to Weber and Chauveau accepting their resignations as Senior Vice President—Project Development and Chief Information Officer, respectively, of Melland. In the letters, de la Motte further reminded Weber and Chauveau that they continued to be bound by their CNDAs with Melland, and warned them not to use and/or disclose the Confidential Technology to anyone else without authorization.

**44.**    Notwithstanding their executed CNDAs, the Consulting Agreement and de la Motte's warning, on March 17, 2008, Defendant Alvion Partners, Weber's wholly-owned company, delivered an ICEF Program deal sheet to Farmer's State Bank, claiming that it was developed and owned by Defendant Alvion Partners. The deal sheet does not mention Melland, nTrust and/or de la Motte.

**45.**    In late June 2008, Estes revealed to West, for the first time, that while in New York in August 2007, he and Chauveau had met privately several times to discuss how a particular application of the Confidential Technology (known as the "card game") could be

COMPLAINT AND JURY DEMAND                                                                          15

implemented for the benefit of TimeData, Chauveau's company, to assist with the raising of capital. Estes and Chauveau had several follow-up conversations after Estes returned to California. During one of these telephone conversations, the following exchange took place:

**Chauveau:**    "You know, Tom, we don't need Allain [de la Motte] and Bob to do this...we can do it without them."

**Estes:**         "…but we owe Bob and Allain."

**Chauveau:**    "we don't owe them shit."

This revelation punctuates what happened in reality and proves that Defendants' scheme to misappropriate the Confidential Technology was in the works as early as August 2007.

 **46.** On information and belief, one or more of the Defendants has misappropriated the ICEF Program and/or all or a portion of the Confidential Technology and used, licensed and/or otherwise disclosed the Confidential Technology and other Melland intellectual property assets, without authorization, to numerous banks and financial institutions including, without limitation, CIBC, Bank of Nova Scotia, Toronto Dominion Bank, Commerce Bancorp, Citibank and unnamed banks in Minnesota and Wisconsin. Such unauthorized disclosures included misrepresentations that the Confidential Technology and Melland's intellectual property assets were developed, owned and/or licensed by one or more of the Defendants. This case has resulted.

**CLAIMS FOR RELIEF/CAUSES OF ACTION**

**COUNT I**

**MISAPPROPRIATION OF TRADE SECRETS**

**(AGAINST ALL DEFENDANTS)**

 **47.** The preceding factual statements and allegations are incorporated herein by reference.

**48.** The Confidential Technology collectively constitute trade secrets pursuant to Or. Rev. Stat. §646.461(4). Plaintiffs made efforts that are reasonable under the circumstances to maintain the secrecy of the Confidential Technology, including the negotiation and execution of the CNDAs with Defendants and other parties that clearly delineate the restrictions on its use and dissemination, pursuant to Or. Rev. Stat. §646.461(4). Plaintiffs derive independent economic value, actual or potential, from the Confidential Technology not being generally known to the public or to other persons who could obtain economic value from its disclosure or use.

**49.** Defendants have misappropriated (and continue to misappropriate and wrongfully abstract, use, disseminate and/or license) the Confidential Technology, within the meaning of Or. Rev. Stat. §646.461(2), by, *inter alia,* (i) calling on, soliciting and/or taking away one or more of Plaintiffs' customers or prospective customers and/or (ii) recruiting and/or attempting to recruit one or more of Plaintiffs' employees or consultants. Defendants' prior and ongoing wrongful actions constitute the misappropriation of trade secrets in violation of Oregon law.

## COUNT II

## **BREACH OF CONTRACT**

### (AGAINST ALL DEFENDANTS)

**50.** The preceding factual statements and allegations are incorporated herein by reference.

**51.** The CNDAs between Plaintiffs and Defendants are viable and enforceable contracts. Pursuant to the CNDAs, Defendants agreed, *inter alia*, to:

(i)    maintain the confidentiality of the Confidential Technology and limit its disclosure;

(ii)   not duplicate and/or distribute the Confidential Technology for any purpose other than Melland's legitimate business purposes; and/or

COMPLAINT AND JURY DEMAND

(iii)    not use, discuss and/or disclose the Confidential Technology for <u>any</u> purpose without prior written approval of Melland.

Defendants breached (and continue to breach) the CNDAs by, *inter alia*, misappropriating the Confidential Technology (as set forth above) and/or abstracting, using, disseminating and/or licensing the Confidential Technology without Plaintiffs' authorization to the financial benefit of Defendants and the financial detriment of Plaintiffs.  Defendants' prior and ongoing wrongful actions constitute breach of contract at Oregon common law.

**COUNT III**

**<u>BREACH OF FIDUCIARY DUTY</u>**

**(AGAINST ALL DEFENDANTS)**

**52.**    The preceding factual statements and allegations are incorporated herein by reference.

**53.**    As officers of Melland with unrestricted access to the Confidential Technology who received detailed instructions regarding the intricacies and nuances of the Confidential Technology, Defendants were (and continue to be) in confidential and fiduciary relationships with Plaintiffs.  As fiduciaries, Defendants owed Plaintiffs (i) the commitment to deal fairly and honestly, (ii) the duties of good faith and undivided loyalty, and (iii) integrity of the strictest kind. Defendants were (and continue to be) obligated to exercise the highest degree of care in carrying out their obligations to Plaintiffs under their confidential, special and fiduciary relationships with Plaintiffs.  Defendants breached (and continue to breach) their fiduciary duties to Plaintiffs by, *inter alia,* misappropriating the Confidential Technology (as set forth above) and/or abstracting, using, disseminating and/or licensing the Confidential Technology without Plaintiffs' authorization to the financial benefit of Defendants and the financial detriment of Plaintiffs.

54.     To the extent that any Defendants are fiduciaries who did not breach the fiduciary duties outlined above, such Defendants are nonetheless liable because they had knowledge of the breaches of fiduciary duties committed by other fiduciaries, and did not make reasonable efforts under the circumstances to remedy such fiduciary breaches.

55.     To the extent that any Defendants are not fiduciaries, such Defendants nevertheless incurred fiduciary liability in that they engaged in transactions with breaching fiduciaries under circumstances in which they knew (or should have known) about such fiduciary breaches.

56.     Defendants breached their fiduciary duties to Plaintiffs through the wrongful actions set forth above. Defendants willfully and wantonly breached their fiduciary duties to Plaintiffs or, at the very least, committed these breaches with conscious indifference and reckless disregard of Plaintiffs' rights and interests. Defendants' prior and ongoing wrongful actions constitute breach of fiduciary duty at Oregon common law.

## COUNT IV

## FRAUD, CONSTRUCTIVE FRAUD AND/OR

## FRAUDULENT CONCEALMENT

### (AGAINST ALL DEFENDANTS)

57.     The preceding factual statements and allegations are incorporated herein by reference.

58.     By virtue of their confidential, special and fiduciary business relationships with Defendants, Plaintiffs trusted and relied on Defendants to safeguard the Confidential Technology and not misappropriate, use, disseminate and/or license the Confidential Technology without Plaintiffs' authorization. Defendants, as fiduciaries, had the duty to Plaintiffs to act in Plaintiffs'

best interest. Plaintiffs, therefore, were in confidential and special business relationships with Defendants that required Defendants not to misappropriate, abstract, use, disseminate and/or license the Confidential Technology (and keep the resulting financial benefits). Defendants, however, intentionally disregarded and/or refused to fulfill their duties to Plaintiffs and misappropriated, abstracted, used, disseminated and/or licensed the Confidential Technology (and kept the resulting financial benefits) (and continue to do so).

59.    Defendants also concealed their wrongful actions until the damage to Plaintiffs was done. All of the above facts were material to the participation (and continued participation) of Plaintiffs in their business relationships with Defendants.

60.    By virtue of the confidential relationships between Plaintiffs and Defendants, Defendants had a duty to disclose the above material facts to Plaintiffs. Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of material facts, is the equivalent of false representations and/or omissions. Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiffs' rights and interests.

61.    Plaintiffs justifiably relied on Defendants' false representations and/or omissions to their detriment by participating in their business relationships with Defendants, granting Defendants unrestricted access to the Confidential Technology and/or disclosing to Defendants the intricacies and nuances of the Confidential Technology. As a direct and proximate result of the Defendants' wrongful acts, Plaintiffs, in fact, participated in their business relationships with Defendants, granted Defendants unrestricted access to the Confidential Technology and/or disclosed to Defendants the intricacies and nuances of the Confidential Technology. Defendants' wrongful actions constitute fraud and/or constructive fraud at Oregon common law.

62.    Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiffs.  Plaintiffs were not aware of nor, through the exercise of due diligence, could have become aware of Defendants' wrongful actions until such wrongful actions were committed and brought to light by third parties.  Due to the Parties' confidential and special business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Defendants had a duty to disclose to Plaintiffs the above material information.  Defendants' failure to do so constitutes fraudulent concealment at Oregon common law.

## COUNT V

## LANHAM ACT 43(A); 15 U.S.C. §1125(A) –FALSE DESIGNATION OF ORIGIN, FALSE ADVERTISING AND PRODUCT DISPARAGEMENT

### (AGAINST ALL DEFENDANTS)

63.    The preceding factual statements and allegations are incorporated herein by reference.

64.    Defendants falsely represented (and continue to falsely represent) to one or more of Plaintiffs' customers and/or prospective customers that Plaintiffs' Confidential Technology and/or intellectual property goods and/or services are Defendants' technology.  Defendants' untrue statements falsely designated the origin of Plaintiffs' Confidential Technology and/or intellectual property goods and/or services and falsely misrepresented the origination, nature and/or qualities of Plaintiffs' Confidential Technology and/or intellectual property goods and/or services (and continue to do so).

65.    Defendants' false material statements deceived, caused confusion and/or mistake, and/or had the tendency to deceive, cause confusion and/or mistake by customers and/or

prospective customers as to (i) the origination of Plaintiffs' Confidential Technology and/or intellectual property goods and/or services and/or (ii) Defendants' affiliation, connection and/or association with Plaintiffs (and continue to do so).

66.     Defendants made such false statements as to (i) the origination of Plaintiffs' Confidential Technology and/or intellectual property goods and/or services and/or (ii) Defendants' affiliation, connection and/or association with Plaintiffs in interstate commerce in connection with one or more attempts to advertise, promote, sell and/or license Plaintiffs' Confidential Technology and/or intellectual property goods and/or services.   Such false statements are material in that they are likely to influence a customer's purchasing decision.

67.     Defendants' false statements disparaged (and continue to disparage) Plaintiffs' Confidential Technology and/or intellectual property goods and/or services by falsely claiming such Confidential Technology and/or intellectual property goods and/or services belong to Defendants and not Plaintiffs.

68.     Defendants also engaged (and continue to engage) in reverse passing off, as well as falsely taking credit for Plaintiffs' Confidential Technology and/or intellectual property goods and/or services.

69.     Plaintiffs have been damaged by Defendants' false statements about Plaintiffs' Confidential Technology and/or intellectual property goods and/or services.

70.     Defendants' wrongful actions were willful, thereby warranting treble damages.

71.     Plaintiffs will continue to be damaged by Defendants' false statements as to the origination of Plaintiffs' Confidential Technology and/or intellectual property goods and/or services, and will continue to unfairly profit from their wrongful acts and be unjustly enriched unless and until they are enjoined by this Court from making such false representations.

72.    Plaintiffs also have suffered irreparable harm due to Defendants' wrongful actions, and will continue to do so unless and until this Court enjoins Defendants from making such false representations.

## COUNT VI

## INTENTIONAL INTERFERENCE WITH EXISTING AND/OR PROSPECTIVE

## BUSINESS RELATIONSHIPS

## (AGAINST ALL DEFENDANTS)

73.    The preceding factual statements and allegations are incorporated herein by reference.

74.    Melland has and/or had existing and/or prospective business relationships with its customers and/or prospective customers, including customers and/or prospective customers during the tenure of Weber and/or Chauveau as officers of Melland.

75.    Such existing and/or prospective business relationships were between Melland and its customers and/or prospective customers.  Defendants were not parties to these business relationships.

76.    Defendants intended to interfere and, in fact interfered with Melland's existing and/or prospective business relationships and economic advantages with one or more customers and/or prospective customers by self dealing, rather than representing Melland during business dealings with these customers and/or prospective customers, by, *inter alia*, (i) fraudulently misrepresenting Plaintiffs' Confidential Technology and/or intellectual property goods and/or services as their own and/or (ii) calling on, soliciting, or taking away, or attempting to call on, solicit, or take away, one or more of Melland's customers or prospective customers, or knew that such interference was substantially certain to occur from their actions.

77.    Defendants interfered with Melland's customers and/or prospective customers through improper means and/or for an improper purpose.   Defendants' interference harmed one or more business relationships between Melland and its customers and/or prospective customers, and will continue to harm such existing and/or prospective business relationships, and damage Melland as a direct and/or proximate, unless enjoined by this Court.   Defendants' wrongful actions constitute tortuous interference with existing and/or prospective business relationships at Oregon common law.

## COUNT VII

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### (AGAINST ALL DEFENDANTS)

78.    The preceding factual statements and allegations are incorporated herein by reference.

79.    Defendants' wrongful actions were committed during the time they were engaged in confidential, special and/or fiduciary relationships with Plaintiffs.   As such, Defendants' wrongful actions also constitute breaches of the duty of good faith and fair dealing owed by Defendants to Plaintiffs at Oregon common law.

## COUNT VIII

## CONVERSION

### (AGAINST ALL DEFENDANTS)

80.    The preceding factual statements and allegations are incorporated herein by reference.

81.    By wrongfully and improperly misappropriating, abstracting, using, disseminating and/or licensing Plaintiffs' Confidential Technology and/or intellectual property goods and/or

services (and keeping the related licensing proceeds) and/or doing so after lawfully obtaining unrestricted access to Plaintiffs' Confidential Technology and/or intellectual property goods and/or services, Defendants are wrongfully exercising dominion and control over Plaintiffs' Confidential Technology and/or intellectual property goods and/or services and the related licensing proceeds in defiance of Plaintiffs' right to possess and use such Confidential Technology and/or intellectual property goods and/or services. Defendants have refused (and continue to refuse) Plaintiffs' demands to stop misappropriating, abstracting, using, disseminating and/or licensing Plaintiffs' Confidential Technology and/or intellectual property goods and/or services (and keeping the related licensing proceeds). Defendants' wrongful acts constitute conversion at Oregon common law.

### COUNT IX

### <u>MONEY HAD AND RECEIVED</u>

### (AGAINST ALL DEFENDANTS)

**82.** The preceding factual statements and allegations are incorporated herein by reference.

**83.** By wrongfully and improperly misappropriating the proceeds from licensing Plaintiffs' Confidential Technology and/or intellectual property goods and/or services, Defendants are wrongfully exercising dominion and control over such licensing proceeds in defiance of Plaintiffs' right to possess and use such licensing proceeds. Defendants have failed and refused (and continue to fail and refuse) to remit such licensing proceeds to Plaintiffs which, in equity and good conscience, belong to Plaintiffs. Plaintiffs, therefore, bring this action as an equitable action for money had and received at Oregon common law.

## COUNT X

## CIVIL CONSPIRACY

### (AGAINST ALL DEFENDANTS)

**84.** The preceding factual statements and allegations are incorporated herein by reference.

**85.** Defendants (and possibly others), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above. Defendants, therefore, conspired to commit the wrongful actions outlined in Counts I-IX, above, all of which directly and proximately caused Plaintiffs to sustain actual and consequential damages. Defendants' wrongful actions constitute civil conspiracy at Oregon common law.

## COUNT XI

## UNJUST ENRICHMENT

### (AGAINST ALL DEFENDANTS)

**86.** The preceding factual statements and allegations are incorporated herein by reference.

**87.** Defendants, at the very least, have been unjustly enriched by the (i) Confidential Technology licensing proceeds, (ii) revenues and profits generated by using such stolen and converted Confidential Technology licensing proceeds, and (iii) return on investment generated by the amounts described in (i) and (ii). Accordingly, Plaintiffs seek to impose a constructive trust over (and recover) all amounts by which Defendants have been unjustly enriched.

## RELIEF REQUESTED

**88.** The preceding factual statements and allegations are incorporated herein by reference.

**89.** **ACTUAL AND CONSEQUENTIAL DAMAGES.** As a direct and/or proximate result of Defendants' wrongful acts and practices, Plaintiffs sustained (and will continue to sustain) actual and/or consequential damages in the form of, *inter alia,* (i) the misappropriation of Plaintiffs' Confidential Technology and/or intellectual property goods and/or services, (ii) corresponding Confidential Technology and/or intellectual property licensing proceeds, and (iii) earnings and profits Plaintiffs would have earned on (i) and (ii). All of the damages sustained by Plaintiffs were reasonably foreseeable by Defendants. Plaintiffs also are entitled to the disgorgement by Defendants of all amounts by which they have been unjustly enriched by their wrongful acts and practices.

**90.** **TREBLE DAMAGES.** Defendants' wrongful actions (and failure to disclose their wrongful actions) were committed intentionally, willfully, with malice and/or with reckless disregard for Plaintiffs' rights and interests. Accordingly, Plaintiffs are entitled to an award of treble damages against Defendants, pursuant to 15 U.S.C. §1117.

**91.** **PUNITIVE DAMAGES.** Defendants' wrongful actions (and failure to disclose their wrongful actions) were committed intentionally, willfully, with malice and/or with reckless disregard for Plaintiffs' rights and interests. Accordingly, Plaintiffs also are entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future, pursuant to, *inter alia*, Or. Rev. Stat. §646.465(3) and/or Oregon common law.

**92.** **INJUNCTIVE RELIEF.** Defendants' ongoing and continuing misappropriation, unauthorized abstraction, unauthorized use, unauthorized dissemination and/or unauthorized

licensing of Plaintiffs' Confidential Technology and/or intellectual property goods and/or services and/or unauthorized retention of the corresponding licensing proceeds has caused (and will continue to cause) Plaintiffs to suffer irreparable harm, which will not cease unless and until enjoined by this Court.  Plaintiffs, therefore, are entitled to an injunction and such other affirmative acts as appropriate pursuant to, *inter alia*, 15 U.S.C. §1116 and Or. Rev. Stat. §646.463.

93. **ATTORNEYS' FEES AND EXPENSES.** Plaintiffs also are entitled to recover their reasonable and necessary attorneys' fees, litigation expenses and court costs pursuant to, *inter alia*, 15 U.S.C. §1117 and Or. Rev. Stat. §646.467(3).

*    *    *

**WHEREFORE,** Plaintiffs request that Defendants be cited to appear and answer this lawsuit and, upon final trial or hearing, judgment be awarded against Defendants, jointly and severally, for:

(i)   actual and/or consequential damages, as set forth above, in an amount to be determined by the trier of fact;

(ii)   all amounts by which Defendants have been unjustly enriched;

(iii)   treble damages;

(iv)   punitive damages;

(v)   injunctive relief providing for all appropriate restrictions on Defendants' future conduct and/or activities;

(vi)   an equitable accounting for all benefits, consideration and profits received, directly or indirectly, by any of Defendants, including the imposition of a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits;

(vii)   pre- and post-judgment interest at the highest legal rate or at a rate equal to Defendants' return on investment, whichever is greater;

COMPLAINT AND JURY DEMAND                                                                28

(viii)    reasonable and necessary attorneys' fees and litigation expenses incurred through the trial and any appeals of this case;

(ix)    costs of suit; and

(x)    such other and further relief to which Plaintiffs are justly entitled.

### JURY DEMAND

Plaintiffs respectfully demand a trial by jury on all of their claims and causes of action so triable.

Respectfully submitted,

By:    _Howard A. Skaist_

Howard A. Skaist, Esq.
**BERKELEY LAW AND TECHNOLOGY GROUP, LLP**
17933 N.W. Evergreen Parkway, Ste. 250
Beaverton, OR 97006
(503) 439-6500
(503) 439-6558 FAX
hskaist@bltg-ip.com

**ATTORNEYS-IN-CHARGE FOR PLAINTIFFS
MELLAND GROUP, LLC AND
ALLAIN L. DE LA MOTTE**

**Of Counsel:**

Katherine F. Horvath, Esq.
**BERKELEY LAW AND TECHNOLOGY GROUP, LLP**
17933 N.W. Evergreen Parkway, Ste. 250
Beaverton, OR 97006
(503) 439-6500
(503) 439-6558 FAX
khorvath@bltg-ip.com

Richard L. Coffman, Esq.
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans St., Ste. 505
Beaumont, TX 77701
(409) 833-7700
(866) 835-8250 FAX
rc@cofflaw.com

James R. Creekmore, Esq.
**THE CREEKMORE LAW FIRM, P.C.**
52 Pondview Court
Daleville, VA 24083
(540) 966-2504
(540) 966-2504 FAX
james@creekmorelaw.com

Charles M. Allen, Esq.
**GOODMAN, ALLEN & FILETTI, PLLC**
4501 Highwoods Parkway, Ste. 210
Glen Allen, VA 23060
(804) 346-5087
(804) 346-5954 FAX
callen@goodmanallen.com