Lawrence H. Reichman, OSB No. 860836
LReichman@perkinscoie.com
Nicholle Y. Winters, OSB No. 054155
NWinters@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
Facsimile: 503.727.2222

Howard Skaist, Esq., OSB No 883482
hskaist@bltg-ip.com
Katherine Ford Horvath, Esq. (admitted pro hac vice)
khorvath@bltg-ip.com
BERKELEY LAW AND TECHNOLOGY
  GROUP, LLP
17933 Evergreen Parkway, Suite 250
Beaverton, OR 97006-7660
Telephone: 503.439.6500
Facsimile: 503.439.6558

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **MELLAND GROUP, LLC d/b/a nTRUST**, an Oregon limited liability company, and **ALLAIN DE LA MOTTE**,<br><br>Plaintiffs,<br><br>v.<br><br>**BERND H. WEBER, CLAUDE J. CHAUVEAU, AMERICAN GULF FINANCE CORP., ALVION PARTNERS, LLC, WEBER, LLC, AGF REALTY SOLUTIONS, INC., ALEXON HOLDINGS INTERNATIONAL LTD., TIMEDATA CORPORATION, TIME DATA HOLDINGS, LLC**, and **DOES 1-10**,<br><br>Defendants. | No. CV'08-957-AC<br><br><br>DECLARATION OF ROBERT M. WEST IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

I, Robert M. West, declare:

1 -  DECLARATION OF ROBERT M. WEST IN
     SUPPORT OF PLAINTIFFS' MOTION FOR
     PRELIMINARY INJUNCTION

69726-0001/LEGAL14952707.1

1.      I am President of Plaintiff, Melland Group, LLC ("Melland"). I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction. The following is true to the best of my knowledge, information and belief.

2.      I have been a resident of the State of Oregon since August 1, 1998, and currently reside in Lake Oswego, Oregon.

3.      I have been involved in the financial consulting services industry for 4 years. I provide operations support for my partner, Plaintiff Allain L. de la Motte ("de la Motte"), who specializes in creating paradigm-shifting, innovative financial structures, strategies and products for banks, financial institutions and companies seeking innovative financing, as well as to the investment community at large.

4.      Melland d/b/a nTrust is an Oregon limited liability company that provides financial consulting services. Melland offers paradigm-shifting, innovative financial structures, strategies and products to banks, financial institutions and companies seeking innovative financing, as well as to the investment community at large.

**Intellectual Property**

5.      Melland is and has been teaming with de la Motte to monetize and market confidential and proprietary financial engineering technologies (business methods) created by de la Motte, including United States, foreign and international pending patent applications.  These financial engineering technologies include (i) "Trust-Linked Banking" technology incorporating a debit card product that pays a trust dividend on deposits held in trust (*e.g.*, the 'Trust-Linked Debit Card"); (ii) institutional capital enhancement funding ("ICEF") technology; (iii) complex "Riskless Principal" or "Principal-Protected" structured investment methods and systems; and (iv) various other finance-related and/or profit generation strategies, proprietary systems, methods and processes. The de la Motte technologies also include trade secret information, such as confidential and proprietary financial tools implementing the financial technologies, including cost data, formulas, compilations, methods, techniques, processes, know-how, information about

2 -   DECLARATION OF ROBERT M. WEST IN
      SUPPORT OF PLAINTIFFS' MOTION FOR
      PRELIMINARY INJUNCTION

69726-0001/LEGAL14952707.1

customer particularities and preferences, pricing and margin information, keys for implementing the technologies for particular applications, spreadsheets, drawings, flowcharts, diagrams, datasheets, deal sheets, term sheets, contracts for implementing different aspects and components of the technologies, and other documents describing and explaining in detail the confidential and proprietary financial technologies and structures for financial transactions utilizing de la Motte's technologies.

6.    Melland also safeguards trade secret information pertaining to its financial technologies, including know-how, information about customer particularities and preferences, pricing and margin information, keys for implementing confidential and proprietary financial technologies for particular applications, spreadsheets, drawings, flowcharts, diagrams, datasheets, deal sheets, term sheets, contracts for implementing different aspects and components of confidential and proprietary financial technologies, and other documents describing and explaining in detail confidential and proprietary financial technologies and structures for financial transactions.

7.    Melland is the applicant for a trademark and service mark, serial no. 77216797, "NTRUST," in connection with goods and services including: electronic data carriers in the form of magnetically encoded debit cards; printed matter and publications, namely, non-magnetically encoded debit cards; and financial services, namely, providing debit card services, administration of the issuance, redemption and processing of cash disbursement, transaction authorization and settlement services in the nature of cash management and electronic case transaction services, formation, operation and termination of trust management accounts, and management of trust accounts that are connected to bank accounts. Melland uses and has used the NTRUST trademark and service mark in commerce in connection with these goods and services. A true and correct copy of the mark application receipt from the USPTO is attached hereto as Exhibit A.

3 -    DECLARATION OF ROBERT M. WEST IN
       SUPPORT OF PLAINTIFFS' MOTION FOR
       PRELIMINARY INJUNCTION

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

8.    Melland uses in commerce the unregistered trademark and service marks "Melland Group," "Melland Group, LLC," "ICEF," and "Institutional Capital Enhancement Funding (ICEF) Program" in conjunction with financial and investment structures, strategies and products, and providing services for creating financial and investment structures, strategies and products. I am aware that de la Motte has many pending patent applications for his financial technology inventions, including broad patent families that encompass the financial technologies for which Melland is and has been working with de la Motte to monetize and market. I will hereafter collectively refer to all of the de la Motte and Melland confidential information, technology and trade secrets described above as the "Confidential Technology." Likewise, I will collectively refer to the Confidential Technology and the technology covered by the pending patent applications together as the "Proprietary Technology."

**Measures to Maintain the Secrecy of the Confidential Technology**

9.    Melland derives independent economic value, actual or potential, from the Confidential Technology not being generally known to the public, and/or to other persons who can obtain economic value from its disclosure or use. It is of the utmost importance to Melland's business to maintain the Confidential Technology in the strictest of confidence. As such, Melland employs measures to maintain the secrecy of this information. Melland does not disclose information about the Confidential Technology without requiring a potential recipient to execute a non-disclosure agreement prohibiting the recipient from disclosing the Confidential Technology. Melland carefully screens and limits potential recipients to whom it will allow disclosure under a non-disclosure agreement (Standard, Melland Confidentiality, Non-Disclosure, Non-Utilization Agreement "CNDA"). Melland password protects documents containing Confidential Technology and, for some aspects of the Confidential Technology, does not allow third parties to possess any copies of documentation (documents are viewable only and always in Melland's possession).

4 -   DECLARATION OF ROBERT M. WEST IN
      SUPPORT OF PLAINTIFFS' MOTION FOR
      PRELIMINARY INJUNCTION

69726-0001/LEGAL14952707.1

**Defendants' Access to and Non-Disclosure Agreements Regarding The Confidential Technology**

10.     During the week of April 2, 2007, Melland appointed Defendant Chauveau its Chief Information Officer. Prior to that, Chauveau, on April 27, 2006, executed a Melland CNDA, which also was applicable to Chauveau's appointment, and pursuant to which Chauveau agreed, among other things, to: maintain the confidentiality of the Confidential Technology and limit its disclosure; not duplicate and/or distribute the Confidential Technology for any purpose other than Melland's legitimate business purposes; and/or not use, discuss and/or disclose the Confidential Technology for <u>any</u> purpose without prior written approval of Melland. A true and correct copy of Chauveau's CNDA is attached as Exhibit B.

11.     During December 2006, Defendant Weber, who represented to Melland that he was the exclusive agent and representative of Alvion Properties, Inc. (a legitimate coal concern based in Harrisburg, Illinois), approached Melland to inquire about sub-licensing all or a portion of the Proprietary Technology. As a condition of sub-licensing the Proprietary Technology, Weber, on December 27, 2006, and ostensibly on behalf of Alvion Properties, Inc., executed a CNDA with Melland containing the same non-disclosure restrictions contained in the CNDA executed by Chauveau. A true and correct copy of Weber's CNDA is attached as Exhibit C.

12.     Pursuant to the executed CNDAs, Melland commenced disclosing, in detail to Chauveau and Weber, the intricacies and nuances of the Proprietary Technology.

13.     In addition to serving as the Melland CIO, Chauveau also owned and operated the TimeData Defendants, which own and license financial time stamping technology. Based on de la Motte's personal relationship with Chauveau and de la Motte's and Melland's business relationships with Chauveau, including his executed CNDA, Melland, in February 2007, agreed to assist Chauveau with capitalizing TimeData by utilizing a portion of the Proprietary Technology. In that regard, on February 12, 2007, Paul Toldalagi, then President and COO of TimeData, executed a CNDA with Melland on behalf of TimeData that contains the same non-

5 -   DECLARATION OF ROBERT M. WEST IN
      SUPPORT OF PLAINTIFFS' MOTION FOR
      PRELIMINARY INJUNCTION

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

disclosure restrictions contained in the CNDAs executed by Chauveau and Weber. A true and correct copy of the TimeData CNDA is attached as Exhibit D. Pursuant to the executed CNDA, we commenced disclosing, in detail to TimeData and its employees, the intricacies and nuances of the Proprietary Technology.

14.     During early May 2007, I, along with de la Motte, traveled to New York to meet with several potential licensees of the Proprietary Technology. We stayed with Chauveau at Chauveau's combination office/condo in Brooklyn, during which time we spent many hours with Chauveau further explaining the Confidential Technology in greater detail. For example, and among other things, we shared with Chauveau multiple Excel spreadsheets containing voluminous information pertaining to different aspects of the Confidential Technology. We also shared with him how this Confidential Technology related to technology covered by de la Motte's pending patent applications.

15.     On September 1, 2007, Weber traveled to Melland's corporate offices in Portland, Oregon to meet with me and de la Motte to further learn about the Proprietary Technology and its application in the marketplace, including application to Alvion Properties, Inc.'s financial situation. Pursuant to the CNDA executed by Weber on behalf of Alvion Properties, Inc., we continued to disclose to Weber, in detail, the intricacies and nuances of the Proprietary Technology.

16.     After participating in multiple in-depth meetings and conferences with Melland officers to learn about the Proprietary Technology, Weber, on November 5, 2007 returned to Portland, and thereafter represented to Melland that Alvion Properties, Inc. was prepared to move forward with sub-licensing and implementing the Proprietary Technology. Prior to returning to Portland, Weber had executed on October 29, 2007, a second CNDA with Melland—this time on behalf of American Gulf, Weber's wholly-owned company. The CNDA contains the same non-disclosure restrictions contained in the CNDAs executed by Chauveau,

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Weber (on behalf of Alvion Properties, Inc.) and TimeData. A true and correct copy of Weber's CNDA on behalf of American Gulf is attached as Exhibit E.

17.    Accordingly, on November 7, 2007, Melland and Alvion Properties, Inc. entered into a Consulting Agreement, pursuant to which Melland, as Consultant ("Consultant") agreed to implement the confidential and proprietary financial technologies for and on behalf of Alvion Properties, Inc. ("Company"). This agreement may be referred to as the "Alvion Coal Deal." A true and correct copy of the Consulting Agreement is attached as Exhibit F.

18.    Weber executed the Consulting Agreement on behalf of Alvion Properties, Inc. as its Chief Financial Officer. The Consulting Agreement contains non-disclosure restrictions similar to the restrictions contained in the CNDAs executed by Chauveau, Weber (on behalf of Alvion Properties, Inc.) and TimeData, and includes additional confidentiality language in Paragraph 3(c) regarding the ownership of any new technologies and/or applications that might result from the efforts of Melland on behalf of Alvion Properties, making it very clear in the concluding sentence that any new technologies and/or applications would belong to Consultant and/or de la Motte, to wit: "*It is expressly agreed that any new ideas, concepts and/or strategies developed by Consultant during the course of providing services to the Company under this Agreement ("New Technology") shall remain the exclusive property of Allain de la Motte and/or Consultant as the case may be. Company hereby waives any rights or interest in any New Technology.*"

19.    As a result of the meetings on November 5-7, 2007, Weber also represented to Melland that he could organize several sub-licensing agreements for the Proprietary Technology with various companies and financial institutions based on his contacts in worldwide financial markets. In that he fashioned himself a "free agent" in the financial marketplace, Weber suggested the best way for him to go about securing additional sub-licensing agreements was for Melland to bestow on him a title. Based on Weber's representations, Melland appointed Weber Senior Vice-President, Project Development.

7 -   DECLARATION OF ROBERT M. WEST IN
      SUPPORT OF PLAINTIFFS' MOTION FOR
      PRELIMINARY INJUNCTION

Perkins Coie LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

20.    On November 26, 2007, I traveled to New York along with de la Motte, Weber and Thomas L. Estes ("Estes"), then acting Chief Investment Officer of Melland, for two weeks of meetings, the principal purpose of which was to engage BNY Mellon to (i) serve as the institutional Trustee for Alvion Properties, Inc.'s coal assets as part of implementing the Proprietary Technology, and (ii) provide or, alternatively, syndicate with other banks a credit facility for which the coal assets would serve as collateral.

### Defendants' Unauthorized Uses of the Confidential Technology

21.    In January 2008, Melland initiated discussions with representatives of Deloitte and Touche, LLP ("Deloitte") in New York to explore a consultancy with Deloitte regarding "banking and accounting regulations" relating to the ICEF Program. Melland and Deloitte ultimately executed a CNDA after several weeks of negotiations. A true and correct copy of the Deloitte CNDA is attached as Exhibit G. I later learned from Alvion Properties that during February 2008, Weber and Chauveau attempted to leverage the Melland/Deloitte relationship by seeking funds from the Alvion Properties' owners to secure a Deloitte opinion and endorsement of the ICEF Program that they, in turn, could use in their efforts to market the Proprietary Technology. Weber and Chauveau did not inform Melland that they attempted to gain this opinion from Deloitte, nor that they attempted to solicit funding for it from Alvion Properties. Melland had not authorized Weber and Chauveau to seek funds from Alvion Properties for such an opinion letter.

22.    Thereafter, Chauveau and Weber engaged me and de la Motte in discussions to form a joint venture—the cornerstone of which was to be the Proprietary Technology. On January 21, 2008, Chauveau delivered to me and de la Motte a document, entitled "BrainTrust" Financial Centre (BFC) L.L.C.," which outlined the proposed partnership between the four parties. "Fundamental" to the proposal was the requirement that de la Motte and Melland assign the Proprietary Technology to the new venture ("Newco"), thereby effectively conferring 1/3 ownership interest each in the Proprietary Technology to Chauveau and Weber. A true and

8 -   DECLARATION OF ROBERT M. WEST IN
      SUPPORT OF PLAINTIFFS' MOTION FOR
      PRELIMINARY INJUNCTION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

correct copy of the "BrainTrust" document is attached as Exhibit A to the Declaration of Allain de la Motte ("de la Motte Declaration"), filed concurrently herewith..

      23.     In the "Title" field of the "properties" section of this Microsoft Word version of the "BrainTrust" document, we found the following note from Weber to Chauveau: *"[t]he creativity braintrust centre to make money off the 'patents' is in Toronto and NYC - so, let's work hard my friend - I am taking a break now and cook for Monda, I had my 9 hours already - therefore, I would suggest you give it a shot first and we get..."* A true and correct copy of a screenshot of the "properties" section of the "BrainTrust" document showing the text discussed above in the "title" field, as well as a true and correct copy of a Word document of the text copied from the "Title" field so that it may be viewed in its entirety, are attached as Exhibit B to the de la Motte Declaration.

      24.     In response to de la Motte communicating that he would not assign his patents and/or pending patent applications or the Confidential Technology, Chauveau and Weber stated their intention to take the Proprietary Technology outright and "go it alone" without de la Motte and Melland. As a result, our negotiations to form Newco ceased.

**Defendants' Unauthorized Disclosures of the Confidential Technology**

      25.     On or about January 18, 2008, I learned that on or about December 19, 2007, while supposedly working on the "Alvion Coal Deal," Weber, without Melland's knowledge, surreptitiously obtained an executed CNDA from Commerce Bancorp in Cherry Hill, New Jersey (a true and correct copy is attached hereto as Exhibit H) by falsely representing to Commerce Bancorp in a letter that AGF Realty and Alvion Partners had a license to the Proprietary Technology. Melland had not authorized Defendants to represent to Commerce Bank that the Proprietary Technology was property of Defendants.

      26.     The CNDA executed by Commerce Bancorp and AGF Realty and Alvion Partners is the same as the Melland CNDA form previously executed by Weber on multiple occasions, but devoid of any references to Melland, nTrust and/or de la Motte. Melland had not

9 -  DECLARATION OF ROBERT M. WEST IN
      SUPPORT OF PLAINTIFFS' MOTION FOR
      PRELIMINARY INJUNCTION

Perkins Coie LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

authorized Defendants to use or alter the Melland document in this manner. I asked Weber why he excluded mention of Melland in this CNDA, but he failed to respond to my question.

27.     On February 11, 2008, Melland sent individual letters to Weber and Chauveau accepting their resignations. These letters were preceded by oral representations made by Weber and Chauveau to Melland's attorneys Seward & Kissell in New York on February 7, 2008, that they no longer intended to "work with us." These letters were addressed to Weber as Senior Vice President—Project Development and Chauveau as Chief Information Officer, respectively, of Melland. In the letters, Melland further reminded Weber and Chauveau that they continued to be bound by their CNDAs with Melland, and warned them not to use and/or disclose the confidential and proprietary financial technologies to anyone else without authorization. True and correct copies of the letters sent to Weber and Chauveau are attached as Exhibits C and D to the de la Motte Declaration.

28.     On or about May 22, 2008, I learned that, consistent with their threats and stated intentions, Weber and Chauveau secretly provided to Brad Henshaw ("Henshaw"), Senior Vice President of Farmer's State Bank in Harrisburg, Illinois, a portion of the ICEF Program. The portion of the ICEF Program provided to Henshaw described some of the Confidential Technology of de la Motte and Melland, but did not mention de la Motte, nTrust or Melland. Melland had not authorized Defendants to disclose the Confidential Technology to Henshaw or Farmer's State Bank. The ICEF information provided by Defendants to Henshaw is attached as Exhibits A-C to the Declaration of Brad Henshaw ("Henshaw Declaration"), filed concurrently herewith.

29.     I also learned that Defendant Alvion Partners had delivered an ICEF Program deal sheet to Farmer's State Bank, claiming that it was Defendant Alvion Partners' technology. The ICEF Program deal sheet describes the Confidential Technology of de la Motte and Melland. The deal sheet does not mention de la Motte, nTrust and/or Melland. Melland had not authorized Defendants to deliver or disclose the ICEF Program deal sheet to Farmer's State Bank. A true

10 - DECLARATION OF ROBERT M. WEST IN
     SUPPORT OF PLAINTIFFS' MOTION FOR
     PRELIMINARY INJUNCTION

69726-0001/LEGAL14952707.1

and correct copy of the ICEF Program deal sheet is attached as Exhibit C to the Henshaw
Declaration.

30.    I also learned that Defendant Weber had delivered a PowerPoint presentation to
Farmer's State Bank discussing an "AP Invent Program," claiming that it was Defendant Alvion
Partners' technology. The content of the PowerPoint presentation describes the Proprietary
Technology of de la Motte and Melland, including the ICEF technology. The PowerPoint
presentation does not mention de la Motte nTrust, and/or Melland. Melland had not authorized
Defendants to deliver or disclose information concerning the ICEF Program to Farmer's State
Bank. A true and correct copy of the PowerPoint presentation discussing the AP Invent Program
is attached as Exhibit D to the Henshaw Declaration.

31.    On or about September 30, 2008, I learned that Weber delivered information,
including an agreement entitled "AGF Asset Management Agreement" to a third party named
Tanglewood Development, LLC ("Tanglewood") in North Carolina, in an apparent attempt to
legitimize himself and his financial expertise in an effort to secure the management of
Tanglewood's real property assets.  Until learning of this unauthorized disclosure by Weber,
Melland had never heard of Tanglewood.   Melland did not authorize Defendants to deliver or
disclose the Confidential Technology to Tanglewood.

32.    On or about November 21, 2008, I learned that Weber delivered a letter to
Tanglewood on behalf of Defendant American Gulf Finance Corporation regarding a "Real
Estate Unit Participation Trust" and in which Weber solicited Tanglewood's participation in a
fund involving Defendant AGF Realty Solutions, LLC and a trust entitled "AGFC Investment
Banking Trust I," which Weber claimed held the assets of Alvion Properties ("the Letter").
Weber dated the Letter on September 27, 2007, prior to Weber assuming a role as officer of
Melland but after he had executed a CDNA on behalf of Alvion Properties.  The Letter is nearly
a word-for-word copy of a document created by Melland describing the Confidential Technology
including specifically terms for a Real Estate Unit Participation Trust (REUPT) that Melland had

11 - DECLARATION OF ROBERT M. WEST IN
        SUPPORT OF PLAINTIFFS' MOTION FOR
        PRELIMINARY INJUNCTION

Perkins Coie LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

been working on for an investor group customer, Choice Equities, since September 2006. The Letter discusses information concerning Confidential Technology for which Choice Equities had executed CNDAs and a Consulting Agreement, and for which Choice Equities had paid. For example, "The Basic Program" is a replication of same from the Melland Term Sheet of the REUPT. The "Structural Overview and Process Description" is verbatim taken from documents prepared by Choice Equities and Melland in preparation for a Private Placement Memorandum being prepared by a Portland law firm and paid for by Choice Equities, and from further documents prepared by Melland. The "Cost and Reimbursement" section is a perfect replica in form, though the money amounts differ, of Melland's estimates given to potential customers and investors in REUPT. Weber lifts portions of protocol Plaintiffs' created for dealing with their customers, the "Melland Relationship Protocol," which he includes in the "Cost and Reimbursement" section of the Letter. Weber represents in the Letter that attorneys Nixon Peabody, LLC and Cadwalader, Wickersham & Taft were to be legal advisors for the deal, but these were Plaintiffs' attorneys whose services Plaintiffs used in connection with Plaintiffs' REUPT. Weber did not even know those attorneys at that time. Despite that the Letter describes Melland's and de la Motte's Confidential Technology, the Letter does not mention of Melland, . nTrust and/or de la Motte. Melland did not authorize Defendants to deliver or disclose the Confidential Technology to Tanglewood, nor did Melland authorize Weber or Defendant American Gulf Finance Corporation or Defendant AGF Realty Solutions, LLC to claim that the Confidential Technology was their technology. A true and correct copy of the Letter sent by Weber to Tanglewood is attached as Exhibit A to the Declaration of Jon S. Crouse, filed concurrently herewith.

33.    Choice Equities' relationship with Melland, as well as the underwriting portion of the work necessary to prepare the Private Placement Agreement had been revealed to Weber by Choice in the many conversations Weber had with their CEO. Weber knew that Melland had agreed in this Consulting Agreement in principal to sub-license de le Motte's technology to

12 - DECLARATION OF ROBERT M. WEST IN
     SUPPORT OF PLAINTIFFS' MOTION FOR
     PRELIMINARY INJUNCTION

Perkins Coie LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

Choice Equities for the REUPT and that they would be the sole, at least initial, sub-licensee for this application.

34.      Weber misrepresents in the Letter that Defendant American Gulf had "licensed access" to the intellectual property described.  However, neither Weber nor Defendant American Gulf had license to Melland and de la Motte's Proprietary Technology.  In fact, Weber had not even signed the CNDA for Defendant American Gulf at that time and Defendant American Gulf did not have Plaintiffs' permission to access the Proprietary Technology let alone use it for their and Weber's own benefit, misrepresent that they had license to it, and/or disclose it to Tanglewood.  (Weber executed the CDNA for Defendant American Gulf on October 29, 2007, a week before coming to Portland to engage us in the Consulting Agreement.)


        I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

        DATED:  December 4, 2008

                                    Robert M. West
                                    _____
                                    Robert M. West

69726-0001 LEGAL14952707.1

Perkins Coie LLP
1120 N.W. Couch Street. Tenth Floor
Portland. OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

# MELLAND GROUP NTRUST TRADEMARK – USPTO
# PER USPTO TESS WEBSITE AS OF SEPTEMBER 1, 2008

# NTRUST

| | |
|---|---|
| **Word Mark** | NTRUST |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: electronic data carriers in the form of magnetically encoded debit cards |
| | IC 016. US 002 005 022 023 029 037 038 050. G & S: printed matter and publications, namely, non-magnetically encoded debit cards |
| | IC 036. US 100 101 102. G & S: financial services, namely, providing debit card services; administration of the issuance, redemption and processing of cash disbursement, transaction authorization and settlement services all in the nature of cash management and electronic cash transaction services; formation, operation and termination of trust management accounts; management of trust accounts that are connected to bank accounts |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 77216797 |
| **Filing Date** | June 27, 2007 |
| **Current Filing Basis** | 1B |
| **Original Filing Basis** | 1B |
| **Owner** | (APPLICANT) Melland Group, LLC LTD LIAB CO OREGON 6700 S.W. Sandburg Rd. Tigard OREGON 97223 |
| **Attorney of Record** | David P. Cooper |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |



**Exhibit A, Page 1**

## RECIPROCAL CONFIDENTIALITY
## AND NON-UTILIZATION AGREEMENT

**THIS RECIPROCAL CONFIDENTIALITY AND NON-UTILIZATION AGREEMENT** (this "**Agreement**") is made by and between Melland Group, LLC, P.O. Box 3622, Hillsboro, OR 97123 (the "**Company**") and

Name: *Claude Chauveau*

Address: *Po Box 1836*

*Beaverton, OR 97075-1836*

City, St., Zip _____

("**Interested Party**") with reference to the following:

### RECITALS

**WHEREAS,** the Company wishes to disclose to Interested Party certain proprietary intellectual property (the "**Technology**") that includes, amongst other things, patent-pending systems and methods that pertain to: (a) a new type of "Trust-Linked Banking" technology that incorporates a Debit Card product that pays a trust dividend on investments of the trust known as a "Trust-Linked Debit Card"; and (b) various other finance-related or investment-related pending patents, trade secrets and proprietary systems and methods belonging to the Company; and

**WHEREAS,** the Company is interested in entering into a licensing or a joint venture agreement with Interested Party regarding the use or application of the Technology; and

**WHEREAS,** in order to conduct such discussions and any subsequent negotiations between the parties, each party may have need of information from the other party that is regarded as confidential to the disclosing party;

**NOW, THEREFORE,** for and in consideration of the foregoing premises, and the mutual promises and undertakings contained herein, the parties hereto agree as follows:

### AGREEMENT

1.    **Definitions.**

1.1    "**Confidential Information,**" as used herein, shall mean information of, entrusted to or in the possession of the disclosing party and disclosed to the recipient by the disclosing party or any third party for or on behalf of the disclosing party, orally or in writing, and which is not generally made available to the public at large, including but not limited to the concepts and business practices underlying the Technology and/or the Services (together referred to as the "**Program**") and shall all plans and proposal relating to the Program, all Program-related contracts, forms and procedures, all Program-related vendor relationships, financial data, costs, margins, software, computer programming, mailing or other marketing lists, customer lists, sources of supply, information concerning employees, any advertising, promotion products or any other information of a proprietary or

Initials _____ (Interested Party)                    Initials _____ (the Company)

**Exhibit B, Page 1**

non-public nature. Confidential Information specifically related to the Technology shall also include information of the Company's of a strategic, financial, technical, research, marketing, operational and/or performance nature, and shall further include trade secrets, roll-out and implementation plans, cost know-how, pricing methodology, projections, software design, computer systems, demonstration programs, routines, algorithms, data systems and databases, techniques, methodologies, designs, procedures, formulas, inventions, discoveries, improvements, concepts, records, files, memoranda, reports, drawings, diagrams, charts, data tables, plans, customer lists, information relating to past, present, and/or future clients, information relating to any research, development, business activities and strategic development plans.

      **1.2**    "**Reasonable Care**" as used herein shall mean the same degree of care exercised by the receiving party with respect to its own Confidential Information, which is of the same nature and sensitivity as Confidential Information provided, by the disclosing party.

      **2.**    **Obligations of Receiving Party.** The parties agree that the recipient of Confidential Information shall upon receipt and thereafter:

      **2.1**    Use Reasonable Care to maintain the confidentiality of such Confidential Information and limit its disclosure to such of its directors, officers, employees or representatives as have a need to know such Confidential Information in order to evaluate and, if appropriate, implement Company's participation in the Program;

      **2.2**    Be responsible for the compliance by its directors, officers, employees or representatives with the provisions of this Agreement;

      **2.3**    Not duplicate or distribute the Confidential Information for any purpose other than as provided in 2.1 above;

      **2.4**    Not use any Confidential Information for any purpose without the prior written approval of the disclosing party;

      **2.5**    Not discuss or disclose Confidential Information except as authorized by this Agreement or except as expressly authorized by the disclosing party;

      **2.6**    Not disclose to third parties that it has possession of any of the Confidential Information, or disclose to third parties that it is contemplating participation in the Program; and

      **2.7**    Not contact, without the disclosing party's prior written consent, any employees of or consultants to, the disclosing party, or any other third party, including any vendors or the Company, to discuss any Confidential Information. (Nothing herein shall prevent the receiving party from contacting the representative of the disclosing party with questions on Confidential Information.)

      **3.**    **Term of Agreement.** This Agreement shall be effective as of the date executed by both parties and may not be terminated except by written mutual agreement. All of the provisions of this Agreement shall survive the return of the Confidential Information to the disclosing party pursuant to Section 5.

Initials _____ (Interested Party)                    Initials _____ (the Company)

**Exhibit B, Page 2**

**4.    Exceptions to Receiving Party's Obligations.** The obligations of a receiving party under this Agreement shall not apply to Confidential Information of the disclosing party to the extent it is:

**4.1**    Information that is available or becomes available to the general public without restriction through no wrongful act or omission of the receiving party;

**4.2**    Information received from a third party having the right to transfer said information;

**4.3**    Information that is independently developed by the receiving party without reference to Confidential Information; or

**4.4**    Disclosed pursuant to a subpoena or order of a court, agency or government authority of competent jurisdiction which is binding on the receiving party provided that the recipient shall immediately notify the disclosing party of and permit the disclosing party to contest any such subpoena or order.

**5.    Return of Confidential Information.** Upon request of the disclosing party, the receiving party shall immediately return to the disclosing party any and all tangible material containing Confidential Information, including any copies thereof and shall represent and warrant that all such documents have been returned. The receiving party shall make no further use or disclosure of any Confidential Information.

**6.    Non-Utilization.**    Both parties acknowledge and agree that they have not been given permission by the other party to utilize any Confidential Information in any way, including, but not limited to, implementing the Program or developing any product or service substantially similar to the Program and that any right to utilize the Confidential Information in providing services and/or products to third parties shall only be pursuant to a subsequent written agreement of the parties. Neither this Agreement nor the transfer of any information hereunder, shall be construed as granting by implication, estoppel, or otherwise, any rights to the Technology.

**7.    Warranties.** The disclosing party warrants that it has the right to disclose to the receiving party Confidential Information under the terms and conditions of this Agreement and that to do so does not violate any obligations to any third party. ALL OTHER WARRANTIES ARE DISCLAIMED, INCLUDING THAT ANY INFORMATION IS FIT FOR A PARTICULAR PURPOSE OR MERCHANTABLE. Without limiting the preceding sentence, the parties make no warranty as to the accuracy or completeness of any information, which may be provided. The receiving party shall rely solely on its own analysis and expertise in determining whether to proceed with any transaction to which such information may pertain. None of the information which may be disclosed regarding the Technology shall constitute any representation, warranty, assurance, guarantee, or inducement of any kind, and, in particular, with respect to the non-infringement of licenses, patents, trademarks, copyrights, trade secrets or any intellectual property rights, or other right of third persons.

**8.    Limitation of Liabilities.** The disclosing party shall not provide the receiving party with its only copy of the Confidential Information. In the event Confidential Information is lost, damaged, stolen or destroyed while in possession or

Initials _____ (Interested Party)                 Initials _____ (the Company)

**Exhibit B, Page 3**

control of the receiving party, the receiving party shall not be responsible for the costs of re-creating such Confidential Information.

**9.     Incorporation of Confidential Information in Other Documents.** In the event that Confidential Information shall be incorporated into other documents, whether separately or jointly generated by the parties, such other documents shall to the extent of such Confidential Information be deemed Confidential Information subject to the terms of this Agreement.

**10.     Injunctive Relief.** The receiving party acknowledges that the Confidential Information has been developed by the disclosing party with substantial effort and at substantial cost and, therefore, has value to the disclosing party; and that breach of any of the provisions of this Agreement could cause the disclosing party irreparable injury for which no adequate remedy at law exists. Accordingly, the disclosing party shall have the right, in addition to any other rights it may have and, by executing this Agreement, the receiving party hereby consents, to the entry in any court having jurisdiction of a temporary or permanent restraining order or injunction restraining or enjoining the receiving party from any violation of this Agreement. The receiving party further agrees to waive, and to use its best efforts to cause its directors, officers, employees and agents to waive, any requirement for the securing or posting of any bond in connection with such remedy.

**11.     Modification.** This Agreement may only be modified in writing executed by both parties.

**12.     Attorney Fees.** In any proceeding to enforce or interpret any of the terms of this Agreement, the prevailing party shall be entitled to recover its costs and attorneys fees.

**13.     Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon. The jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in the State of Oregon.

**14.     Arbitration.** Any disputes among the parties shall be decided by arbitration before the American Arbitration Association sitting in Portland, Oregon and in accordance with the Commercial Rules of the AAA.

**IN WITNESS WHEREOF,** the parties hereto (or their duly authorized representatives) have affixed their signature on the date set forth below.

Accepted by:                                          Accepted by:
**INTERESTED PARTY**                                  **MELLAND GROUP, LLC**

X _____                           X _____
By: _Claude Cranveau_                                 By: _Alain L. de La Motte_
Title _Individual_                                    Title _Chairman_
Date: _4/27/2006_                                     Date: _April 27, 2006_

Initials _____ (Interested Party)                   Initials _____ (the Company)

**Exhibit B, Page 4**

# CONFIDENTIALITY, NON-DISCLOSURE AND NON-UTILIZATION AGREEMENT

**THIS CONFIDENTIALITY NON-DISCLOSURE, AND NON-UTILIZATION AGREEMENT** (this "**Agreement**"), dated as of December 27, 2006, (the "**Effective Date**") is made by and between **Melland Group, LLC**, an Oregon limited liability company located at P.O. Box 3622, Hillsboro, OR 97123 (the "**Company**") and

| | |
|---|---|
| Name: | Alvion Properties, Inc. |
| Address: | Suite Two-Twenty-Two, South Main |
| City, State, Zip: | Harrisburg, Illinois 62946 |

(the "**Interested Party**") with reference to the following:

## RECITALS

**WHEREAS**, the Company wishes to disclose to the Interested Party certain proprietary intellectual property and business processes (the "**Technology**") that includes, amongst other things, patent-pending systems and methods that pertain to: (a) a new type of "Trust-Linked Banking" technology that incorporates a Debit Card product that pays a trust dividend on investments of the trust known as a "Trust-Linked Debit Card"; (b) a full-featured banking by cell phone system designed to protect cardholders identity and card transactions against fraud while allowing banking transactions to occur instantly via a cell phone; and (c) various other finance-related or profit generation activities, pending patents, trade secrets and proprietary systems, methods and processes belonging to the Company or to third-party inventors; and

**WHEREAS**, in order to conduct such discussions and any subsequent negotiations between the parties, the Company may disclose Confidential Information (as defined herein) to the Interested Party;

**NOW, THEREFORE**, for and in consideration of the foregoing premises, and the mutual promises and undertakings contained herein, the parties hereto agree as follows:

## AGREEMENT

1.  **Definitions.**

    1.1    "**Confidential Information**," as used herein, shall mean information of, entrusted to or in the possession of the Company and disclosed to the Interested Party by the Company or any third party for or on behalf of the Company, orally or in writing, and which is not generally made available to the public at large, including but not limited to the concepts and business practices underlying the Technology and any potential related services (hereinafter jointly referred to as the "**Program**") and all plans and proposal relating to the Program, all Program-related contracts, forms and procedures, all Program-related vendor relationships, financial data, costs, margins, software, computer programming, mailing or other marketing lists, customer lists, sources of supply, information concerning employees, any advertising, promotion products or any other information of a proprietary or non-public nature. Confidential Information specifically related to the Technology shall also include information of the Company's of a strategic, financial, technical, research, marketing, operational and/or performance nature, and shall further include trade secrets, roll-out and implementation plans, cost know-how, pricing methodology, projections, software design, computer systems, demonstration programs, routines, algorithms, data systems and databases, techniques, methodologies, designs, procedures, formulas, inventions, discoveries, improvements, concepts, records, files, memoranda, reports, drawings, diagrams, charts, data tables, plans, customer lists, information relating to past, present, and/or future clients, information relating to any research, development, business activities and strategic development plans.

Initials _____ (Interested Party)          Initials _____ (the Company)

Exhibit C, Page 1

Reciprocal Confidentiality & Non-Utilization Agreement                    Page 2 of 4

       **1.2**    "**Reasonable Care**" as used herein shall mean the same degree of care exercised by any prudent person with respect to information of a highly sensitive nature.

       **2.**    **Obligations of Interested Party.** The parties agree that the Interested Party as recipient of Confidential Information shall upon receipt and thereafter:

       **2.1**    Use Reasonable Care to maintain the confidentiality of such Confidential Information and limit its disclosure to such of its directors, officers, employees or representatives as have a need to know such Confidential Information in order to evaluate and, if appropriate, implement the Company's participation in the Program;

       **2.2**    Require its directors, officers, employees or representatives to execute an agreement with provisions similar to this Agreement;

       **2.3**    Not duplicate or distribute the Confidential Information for any purpose other than as provided in Section 2.1 above;

       **2.4**    Not use any Confidential Information for any purpose without the prior written approval of the Company;.

       **2.5**    Not discuss or disclose Confidential Information except as authorized by this Agreement or except as expressly authorized by the Company;

       **2.6**    Not disclose to third parties that it has possession of any of the Confidential Information, or disclose to third parties that it is contemplating participation in the Program; and

       **2.7**    Not contact, without the Company's prior written consent, any employees of or consultants to, the Company, or any other third party, including any vendors or the Company, to discuss any Confidential Information. (Nothing herein shall prevent the Interested Party from contacting the representative of the Company with questions on Confidential Information.)

       **3.**    **Term of Agreement.** The term of this Agreement is five (5) years from the Effective Date. All of the provisions of this Agreement shall survive the return of the Confidential Information to the Company pursuant to Section 5.

       **4.**    **Exceptions to Interested Party's Obligations.** The obligations of a Interested Party under this Agreement shall not apply to Confidential Information of the Company to the extent it is:

       **4.1**    Information that is available or becomes available to the general public without restriction through no wrongful act or omission of the Interested Party;

       **4.2**    Information received from a third party having the right to transfer said information;

       **4.3**    Information that is independently developed by the Interested Party without reference to Confidential Information; or

       **4.4**    Disclosed pursuant to a subpoena or order of a court, agency or government authority of competent jurisdiction which is binding on the Interested Party provided that the Interested Party shall, to the extent permitted thereunder, immediately notify the Company of and permit the Company to contest any such subpoena or order.

       **5.**    **Return of Confidential Information.** Upon request of the Company, the Interested Party shall immediately return to the Company any and all tangible material containing Confidential Information, including any copies thereof and shall represent and warrant that all such documents have been returned. The Interested Party shall make no further use or disclosure of any Confidential Information.

Initial: _____ (Interested Party)                 Initials _____ (the Company)

**Exhibit C, Page 2**

**6.      Non-Utilization.**  Both parties acknowledge and agree that they have not been given permission by the other party to utilize any Confidential Information in any way, including, but not limited to, implementing the Program or developing any product or service substantially similar to the Program and that any right to utilize the Confidential Information in providing services and/or products to third parties shall only be pursuant to a subsequent written agreement of the parties.  Neither this Agreement nor the transfer of any information hereunder, shall be construed as granting by implication, estoppel, or otherwise, any rights to the Technology.

**7.      Warranties.** The Company warrants that it has the right to disclose to the Interested Party Confidential Information under the terms and conditions of this Agreement and that to do so does not violate any obligations to any third party. ALL OTHER WARRANTIES ARE DISCLAIMED, INCLUDING THAT ANY INFORMATION IS FIT FOR A PARTICULAR PURPOSE OR MERCHANTABLE. Without limiting the preceding sentence, the parties make no warranty as to the accuracy or completeness of any information, which may be provided. The Interested Party shall rely solely on its own analysis and expertise in determining whether to proceed with any transaction to which such information may pertain.  None of the information which may be disclosed regarding the Technology shall constitute any representation, warranty, assurance, guarantee, or inducement of any kind, and, in particular, with respect to the non-infringement of licenses, patents, trademarks, copyrights, trade secrets or any intellectual property rights, or other right of third persons.

**8.      Limitation of Liabilities.** The Company shall not provide the Interested Party with its only copy of the Confidential Information. In the event Confidential Information is lost, damaged, stolen or destroyed while in possession or control of the Interested Party, the Interested Party shall not be responsible for the costs of re-creating such Confidential Information.

**9.      Incorporation of Confidential Information in Other Documents.** In the event that Confidential Information shall be incorporated into other documents, whether separately or jointly generated by the parties, such other documents shall to the extent of such Confidential Information be deemed Confidential Information subject to the terms of this Agreement.

**10.     Injunctive Relief.** The Interested Party acknowledges that the Confidential Information has been developed by the Company with substantial effort and at substantial cost and, therefore, has value to the Company; and that breach of any of the provisions of this Agreement could cause the Company irreparable injury for which no adequate remedy at law exists. Accordingly, the Company shall have the right, in addition to any other rights it may have and, by executing this Agreement, the Interested Party hereby consents, to the entry in any court having jurisdiction of a temporary or permanent restraining order or injunction restraining or enjoining the Interested Party from any violation of this Agreement. The Interested Party further agrees to waive, and to use its best efforts to cause its directors, officers, employees and agents to waive, any requirement for the securing or posting of any bond in connection with such remedy.

**11.     Damages.** Any breach of this agreement by the Interested Party shall render the Interested Party liable to the Company for liquidated damages in the amount of ten thousand ($10,000) dollars per breach.  The Company shall have the right to seek either remedy provided in Section 10 or Section 11.

**12.     Modification.** This Agreement may only be modified in writing executed by both parties.

**13.     Attorney Fees.** In any proceeding to enforce or interpret any of the terms of this Agreement, the prevailing party shall be entitled to recover its costs and attorneys fees.

Initials ___ (Interested Party)                    Initials _____ (the Company)

**Exhibit C, Page 3**

Reciprocal Confidentiality & Non-Utilization Agreement                     Page 4 of 4

   14.    **Governing Law.** This Agreement shall be governed by and construed in
accordance with the laws of the State of New York. The jurisdiction and venue for any legal
proceeding to interpret or enforce this Agreement shall be in the State of New York.

   15.    **Arbitration.** All disputes in connection with this Agreement or the execution
thereof shall be settled through friendly negotiations. In the event that no settlement can be
reached within thirty (30) days of the initial date of the dispute, either of the Parties may then
submit the dispute to the American Arbitration Association sitting in New York, New York and
in accordance with the Commercial Rules of the AAA. All decisions of the arbitrator shall be
final and binding upon both parties. Neither party shall seek recourse in a court of law or
appeal to other authorities for relief. Arbitration costs shall be borne by the losing party.

   16.    **Facsimile Transmissions.** Should this Agreement or any subsequent
addendum be transmitted by facsimile or electronic mail, the signed facsimile document shall
be considered as an original, both binding and enforceable. Further, this Agreement and/or
any addendum hereto may be executed and delivered in multiple counterparts (via either hard
copy, electronic mail or facsimile), and each counterpart so delivered that bears the signature
of a party hereto shall be binding as to such party, and all counterparts together shall
constitute the original. Any party delivering this Agreement, and/or an addendum hereto, by
facsimile or electronic mail shall also forthwith deliver to the other party by an internationally
recognized courier service the counterpart of this Agreement and/or any addendum hereto
that bears such party's original signature.

   **IN WITNESS WHEREOF,** the parties hereto (or their duly authorized representatives)
have affixed their signature on the date set forth below.

Accepted by:                                    Accepted by:
**INTERESTED PARTY**                            **MELLAND GROUP, LLC**

Name: Alvion Properties, Inc.

X _____               X _Robert M. West_____
By:    Bernd H. Weber                    By:  _Robert M. West_
Title    CFO                             Title  _President_
Date:    December 27, 2006               Date:  _1/3/06_



Initials _____ (Interested Party)          Initials _____ (the Company)


                                             **Exhibit C, Page 4**

# CONFIDENTIALITY AND NON-UTILIZATION AGREEMENT

THIS CONFIDENTIALITY AND NON-UTILIZATION AGREEMENT (this "Agreement"), dated as of _February 12_, 2007_, (the "Effective Date") is made by and between Meiland Group, LLC, an Oregon limited liability company located at P.O. Box 3622, Hillsboro, OR 97123 (the "Company") and

| | |
|---|---|
| Name: | TimeData Corp. |
| Address: | 845 Third Avenue - 6th Floor |
| City, State, Zip: | New York, NY 10022-6601 |

(the "Interested Party") with reference to the following:

## RECITALS

WHEREAS, the Interested Party is interested in exploring certain financing vehicles ("Products") created by the Company and the Company wishes to disclose to the Interested Party a minimum of proprietary intellectual property assets including, but not limited to, pending patents, trade secrets, systems, methods and processes in financial engineering, trust-linked banking, hedge fund development and operation and various other finance-related or profit generation activities that belong to the Company or to third-party inventors (the "Technology") as requested in writing by the Interested Party to satisfy its own diligence of said Company Products; and

WHEREAS, in order to conduct such discussions and any subsequent negotiations between the parties, the Company may disclose Confidential Information to the Interested Party (as defined herein) and only after explicit initiation/request in writing of such disclosure by the Interested Party;

NOW, THEREFORE, for and in consideration of the foregoing premises, and the mutual promises and undertakings contained herein, the parties hereto agree as follows:

## AGREEMENT

1.    **Definitions.**

    **1.1    "Confidential Information,"** as used herein, shall mean information of, entrusted to or in the possession of the Company and disclosed to the Interested Party by the Company or any third party for or on behalf of the Company, orally or in writing, and which is not generally made available to the public at large, including but not limited to the concepts and business practices underlying the Technology and any potential related services (hereinafter jointly referred to as the **"Program"**) and all plans and proposal relating to the Program, all Program-related contracts, forms and procedures, all Program-related vendor relationships, financial data, costs, margins, software, computer programming, mailing or other marketing lists, customer lists, sources of supply, information concerning employees, any advertising, promotion products or any other information of a proprietary or non-public nature.  Confidential Information specifically related to the Technology shall also include information of the Company's of a strategic, financial, technical, research, marketing, operational and/or performance nature, and shall further include trade secrets, roll-out and implementation plans, cost know-how, pricing methodology, projections, software design, computer systems, demonstration programs, routines, algorithms, data systems and databases, techniques, methodologies, designs, procedures, formulas, inventions, discoveries, improvements, concepts, records, files, memoranda, reports, drawings, diagrams, charts, data tables, plans, customer lists, information relating to past, present, and/or future clients, information relating to any research, development, business activities and strategic development plans.

Initials __R___ (Interested Party)                    Initials __W__ (the Company)

**1.2** "Reasonable Care" as used herein shall mean the same degree of care exercised by any prudent person with respect to information of a highly sensitive nature.

**2.** **Obligations of Interested Party.** The parties agree that the Interested Party as recipient of Confidential Information shall upon receipt and thereafter:

**2.1** Use Reasonable Care to maintain the confidentiality of such Confidential Information and limit its disclosure to such of its directors, officers, employees or representatives as have a need to know such Confidential Information in order to evaluate and, if appropriate, implement the Company's participation in the Program;

**2.2** Require its directors, officers, employees or representatives to execute an agreement with provisions similar to this Agreement;

**2.3** Not duplicate or distribute the Confidential Information for any purpose other than as provided in Section 2.1 above;

**2.4** Not use any Confidential Information for any purpose without the prior written approval of the Company;

**2.5** Not discuss or disclose Confidential Information except as authorized by this Agreement or except as expressly authorized by the Company;

**2.6** Not disclose to third parties that it has possession of any of the Confidential Information, or disclose to third parties that it is contemplating participation in the Program; and

**2.7** Not contact, without the Company's prior written consent, any employees of or consultants to, the Company, or any other third party, including any vendors or the Company, to discuss any Confidential Information. (Nothing herein shall prevent the Interested Party from contacting the representative of the Company with questions on Confidential Information.)

**3.** **Term of Agreement.** The term of this Agreement is five (5) years from the Effective Date. All of the provisions of this Agreement shall survive the return of the Confidential Information to the Company pursuant to Section 5.

**4.** **Exceptions to Interested Party's Obligations.** The obligations of the Interested Party under this Agreement shall not apply to Confidential Information of the Company to the extent it is:

**4.1** Information that is available or becomes available to the general public without restriction through no wrongful act or omission of the Interested Party;

**4.2** Information received from a third party having the right to transfer said information;

**4.3** Information that is independently developed by the Interested Party without reference to Confidential Information; or

**4.4** Disclosed pursuant to a subpoena or order of a court, agency or government authority of competent jurisdiction which is binding on the Interested Party provided that the Interested Party shall, to the extent permitted thereunder, immediately notify the Company of and permit the Company to contest any such subpoena or order.

**5.** **Return of Confidential Information.** Upon request of the Company, the Interested Party shall immediately return to the Company any and all tangible material containing Confidential Information, including any copies thereof and shall represent and warrant that all such documents have been returned. The Interested Party shall make no further use or disclosure of any Confidential Information.

Initials ___ (Interested Party)                    Initials _____ (the Company)

**Exhibit D, Page 2**

6.      **Non-Utilization.** Both parties acknowledge and agree that they have not been given permission by the other party to utilize any Confidential Information in any way, including, but not limited to, implementing the Program or developing any product or service substantially similar to the Program and that any right to utilize the Confidential Information in providing services and/or products to third parties shall only be pursuant to a subsequent written agreement of the parties. Neither this Agreement nor the transfer of any Information hereunder, shall be construed as granting by implication, estoppel, or otherwise, any rights to the Technology.

7.      **Warranties.** The Company warrants that it has the right to disclose to the Interested Party Confidential Information under the terms and conditions of this Agreement and that to do so does not violate any obligations to any third party. ALL OTHER WARRANTIES ARE DISCLAIMED, INCLUDING THAT ANY INFORMATION IS FIT FOR A PARTICULAR PURPOSE OR MERCHANTABLE. Without limiting the preceding sentence, the parties make no warranty as to the accuracy or completeness of any Information, which may be provided. The Interested Party shall rely solely on its own analysis and expertise in determining whether to proceed with any transaction to which such Information may pertain. None of the Information which may be disclosed regarding the Technology shall constitute any representation, warranty, assurance, guarantee, or inducement of any kind, and, in particular, with respect to the non-infringement of licenses, patents, trademarks, copyrights, trade secrets or any intellectual property rights, or other right of third persons.

8.      **Limitation of Liabilities.** The Company shall not provide the Interested Party with its only copy of the Confidential Information. In the event Confidential Information is lost, damaged, stolen or destroyed while in possession or control of the Interested Party, the Interested Party shall not be responsible for the costs of re-creating such Confidential Information.

9.      **Incorporation of Confidential Information in Other Documents.** In the event that Confidential Information shall be incorporated into other documents, whether separately or jointly generated by the parties, such other documents shall to the extent of such Confidential Information be deemed Confidential Information subject to the terms of this Agreement.

10.     **Injunctive Relief.** The Interested Party acknowledges that the Confidential Information has been developed by the Company with substantial effort and at substantial cost and, therefore, has value to the Company; and that breach of any of the provisions of this Agreement could cause the Company irreparable injury for which no adequate remedy at law exists. Accordingly, the Company shall have the right, in addition to any other rights it may have and, by executing this Agreement, the Interested Party hereby consents, to the entry in any court having jurisdiction of a temporary or permanent restraining order or injunction restraining or enjoining the Interested Party from any violation of this Agreement. The Interested Party further agrees to waive, and to use its best efforts to cause its directors, officers, employees and agents to waive, any requirement for the securing or posting of any bond in connection with such remedy.

11.     **Modification.** This Agreement may only be modified in writing executed by both parties.

12.     **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in the State of New York.

13.     **Arbitration.** All disputes in connection with this Agreement or the execution thereof shall be settled through friendly negotiations. In the event that no settlement can be reached within thirty (30) days of the initial date of the dispute, either of the Parties may then submit the dispute to the American Arbitration Association ("AAA") sitting in New York, New York and in accordance with the Commercial Rules of the AAA. All decisions of the arbitrator shall be final and binding upon both parties. Neither party shall seek recourse in a court of

Initials ____ (Interested Party)                              Initials _____ (the Company)

**Exhibit D, Page 3**

Reciprocal Confidentiality & Non-Utilization Agreement                    Page 4 of 4

law or appeal to other authorities for relief.  Arbitration costs shall be borne by the losing
party.

   14.    Facsimile Transmissions.  Should this Agreement or any subsequent
addendum be transmitted by facsimile or electronic mail, the signed facsimile document shall
be considered as an original, both binding and enforceable.  Further, this Agreement and/or
any addendum hereto may be executed and delivered in multiple counterparts (via either hard
copy, electronic mail or facsimile), and each counterpart so delivered that bears the signature
of a party hereto shall be binding as to such party, and all counterparts together shall
constitute the original.  Any party delivering this Agreement, and/or an addendum hereto, by
facsimile or electronic mail also forthwith deliver to the other party by an internationally
recognized courier service the counterpart of this Agreement and/or any addendum hereto
that bears such party's original signature.

   IN WITNESS WHEREOF, the parties hereto (or their duly authorized representatives)
have affixed their signature on the date set forth below.

Accepted by:                                Accepted by:
INTERESTED PARTY                            MELLAND GROUP, LLC

Name:  TIMEDATA CORP.

X _____                   X _____
By:    Paul Toldalagi                        By:   Robert M. West
Title  President/COO                         Title  President
Date:  Feb 12 2007                           Date: Feb 13, 2007


Name:  Paul Toldalagi

X _____
Paul Toldalagi
Date:   Feb 12 2007


Initials ____ (Interested Party)            Initials ____ (the Company)


**Exhibit D, Page 4**

# CONFIDENTIALITY, NON-DISCLOSURE AND NON-UTILIZATION AGREEMENT

THIS CONFIDENTIALITY, NON-DISCLOSURE, AND NON-UTILIZATION AGREEMENT (this "**Agreement**"), dated as of October 29, 2007, (the "**Effective Date**") is made by and between **Melland Group, LLC**, an Oregon limited liability company located at 6700 SW Sandburg Road, Tigard, OR 97223 (the "**Company**") and

| | |
|---|---|
| Name: | American Gulf Finance Corporation |
| Address: | P.O. Box 613, Kingstown, St. Vincent & the Grenadines |
| | c/o Weber, Krapp & Kollegen Steuerberatungsgesellschaft mbH |
| | Bahnhofstrasse 18 |
| City, State, Zip: | D-59929 Brilon, Germany |

(the "**Interested Party**") with reference to the following:

## RECITALS

**WHEREAS**, the Company wishes to disclose to the Interested Party certain proprietary intellectual property and business processes (the "**Technology**") that includes, amongst other things, patent-pending systems and methods that pertain to: (a) a new type of "Trust-Linked Banking" technology that incorporates a Debit Card product that pays a trust dividend on investments of the trust known as a "Trust-Linked Debit Card"; (b) a full-featured banking by cell phone system designed to protect cardholders identity and card transactions against fraud while allowing banking transactions to occur instantly via a cell phone; and (c) various other finance-related or profit generation activities, pending patents, trade secrets and proprietary systems, methods and processes belonging to the Company or to third-party inventors; and

**WHEREAS**, in order to conduct such discussions and any subsequent negotiations between the parties, the Company may disclose Confidential Information (as defined herein) to the Interested Party;

**NOW, THEREFORE**, for and in consideration of the foregoing premises, and the mutual promises and undertakings contained herein, the parties hereto agree as follows:

## AGREEMENT

1. **Definitions.**

   1.1 "**Confidential Information**," as used herein, shall mean information of, entrusted to or in the possession of the Company and disclosed to the Interested Party by the Company or any third party for or on behalf of the Company, orally or in writing, and which is not generally made available to the public at large, including but not limited to the concepts and business practices underlying the Technology and any potential related services (hereinafter jointly referred to as the "**Program**") and all plans and proposal relating to the Program, all Program-related contracts, forms and procedures, all Program-related vendor relationships, financial data, costs, margins, software, computer programming, mailing or other marketing lists, customer lists, sources of supply, information concerning employees, any advertising, promotion products or any other information of a proprietary or non-public nature. Confidential Information specifically related to the Technology shall also include information of the Company's of a strategic, financial, technical, research, marketing, operational and/or performance nature, and shall further include trade secrets, roll-out and implementation plans, cost know-how, pricing methodology, projections, software design, computer systems, demonstration programs, routines, algorithms, data systems and databases, techniques, methodologies, designs, procedures, formulas, inventions, discoveries, improvements, concepts, records, files, memoranda, reports, drawings, diagrams, charts, data tables, plans, customer lists, information relating to past, present, and/or future clients,

Initials _____ (Interested Party)          Initials _____ (the Company)

**Exhibit E, Page 1**

information relating to any research, development, business activities and strategic development plans.

      1.2    "**Reasonable Care**" as used herein shall mean the same degree of care exercised by any prudent person with respect to information of a highly sensitive nature.

    2.    **Obligations of Interested Party.** The parties agree that the Interested Party as recipient of Confidential Information shall upon receipt and thereafter:

      2.1    Use Reasonable Care to maintain the confidentiality of such Confidential Information and limit its disclosure to such of its directors, officers, employees or representatives as have a need to know such Confidential Information in order to evaluate and, if appropriate, implement the Company's participation in the Program;

      2.2    Require its directors, officers, employees or representatives to execute an agreement with provisions similar to this Agreement;

      2.3    Not duplicate or distribute the Confidential Information for any purpose other than as provided in Section 2.1 above;

      2.4    Not use any Confidential Information for any purpose without the prior written approval of the Company;

      2.5    Not discuss or disclose Confidential Information except as authorized by this Agreement or except as expressly authorized by the Company;

      2.6    Not disclose to third parties that it has possession of any of the Confidential Information, or disclose to third parties that it is contemplating participation in the Program; and

      2.7    Not contact, without the Company's prior written consent, any employees of or consultants to, the Company, or any other third party, including any vendors or the Company, to discuss any Confidential Information. (Nothing herein shall prevent the Interested Party from contacting the representative of the Company with questions on Confidential Information.)

    3.    **Term of Agreement.** The term of this Agreement is five (5) years from the Effective Date. All of the provisions of this Agreement shall survive the return of the Confidential Information to the Company pursuant to Section 5.

    4.    **Exceptions to Interested Party's Obligations.** The obligations of an Interested Party under this Agreement shall not apply to Confidential Information of the Company to the extent it is:

      4.1    Information that is available or becomes available to the general public without restriction through no wrongful act or omission of the Interested Party;

      4.2    Information received from a third party having the right to transfer said information;

      4.3    Information that is independently developed by the Interested Party without reference to Confidential Information; or

      4.4    Disclosed pursuant to a subpoena or order of a court, agency or government authority of competent jurisdiction which is binding on the Interested Party provided that the Interested Party shall, to the extent permitted thereunder, immediately notify the Company of and permit the Company to contest any such subpoena or order.

    5.    **Return of Confidential Information.** Upon request of the Company, the Interested Party shall immediately return to the Company any and all tangible material

Initials _____ (Interested Party)                    Initials _____ (the Company)

**Exhibit E, Page 2**

Reciprocal Confidentiality & Non-Utilization Agreement                                    Page 3 of 4

containing Confidential Information, including any copies thereof and shall represent and warrant that all such documents have been returned. The Interested Party shall make no further use or disclosure of any Confidential Information.

**6.       Non-Utilization.**   Both parties acknowledge and agree that they have not been given permission by the other party to utilize any Confidential Information in any way, including, but not limited to, implementing the Program or developing any product or service substantially similar to the Program and that any right to utilize the Confidential Information in providing services and/or products to third parties shall only be pursuant to a subsequent written agreement of the parties. Neither this Agreement nor the transfer of any information hereunder, shall be construed as granting by implication, estoppel, or otherwise, any rights to the Technology.

**7.       Warranties.** The Company warrants that it has the right to disclose to the Interested Party Confidential Information under the terms and conditions of this Agreement and that to do so does not violate any obligations to any third party. ALL OTHER WARRANTIES ARE DISCLAIMED, INCLUDING THAT ANY INFORMATION IS FIT FOR A PARTICULAR PURPOSE OR MERCHANTABLE. Without limiting the preceding sentence, the parties make no warranty as to the accuracy or completeness of any information, which may be provided. The Interested Party shall rely solely on its own analysis and expertise in determining whether to proceed with any transaction to which such information may pertain. None of the information which may be disclosed regarding the Technology shall constitute any representation, warranty, assurance, guarantee, or inducement of any kind, and, in particular, with respect to the non-infringement of licenses, patents, trademarks, copyrights, trade secrets or any intellectual property rights, or other right of third persons.

**8.       Limitation of Liabilities.** The Company shall only provide the Interested Party with copies, not originals, of the Confidential Information. In the event Confidential Information is lost, damaged, stolen or destroyed while in possession or control of the Interested Party, the Interested Party shall not be responsible for the costs of re-creating such Confidential Information.

**9.       Incorporation of Confidential Information in Other Documents.** In the event that Confidential Information shall be incorporated into other documents, whether separately or jointly generated by the parties, such other documents shall to the extent of such Confidential Information be deemed Confidential Information subject to the terms of this Agreement.

**10.      Injunctive Relief.** The Interested Party acknowledges that the Confidential Information has been developed by the Company with substantial effort and at substantial cost and, therefore, has value to the Company; and that breach of any of the provisions of this Agreement could cause the Company irreparable injury for which no adequate remedy at law exists. Accordingly, the Company shall have the right, in addition to any other rights it may have and, by executing this Agreement, the Interested Party hereby consents, to the entry in any court having jurisdiction of a temporary or permanent restraining order or injunction restraining or enjoining the Interested Party from any violation of this Agreement. The Interested Party further agrees to waive, and to use its best efforts to cause its directors, officers, employees and agents to waive, any requirement for the securing or posting of any bond in connection with such remedy.

**11.      Damages.** Any breach of this agreement by the Interested Party shall render the Interested Party liable to the Company for liquidated damages in the amount of ten thousand ($10,000) dollars per breach. The Company shall have the right to seek either remedy provided in Section 10 or Section 11.

**12.      Modification.** This Agreement may only be modified in writing executed by both parties.

**13.      Attorney Fees.** In any proceeding to enforce or interpret any of the terms of this Agreement, the prevailing party shall be entitled to recover its costs and attorneys fees.

Initials _____ (Interested Party)                          Initials _____ (the Company)

**Exhibit E, Page 3**

**14.    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in the State of New York.

**15.    Arbitration.** All disputes in connection with this Agreement or the execution thereof shall be settled through friendly negotiations. In the event that no settlement can be reached within thirty (30) days of the initial date of the dispute, either of the Parties may then submit the dispute to the American Arbitration Association sitting in New York, New York and in accordance with the Commercial Rules of the AAA. All decisions of the arbitrator shall be final and binding upon both parties. Neither party shall seek recourse in a court of law or appeal to other authorities for relief. Arbitration costs shall be borne by the losing party.

**16.    Facsimile Transmissions.** Should this Agreement or any subsequent addendum be transmitted by facsimile or electronic mail, the signed facsimile document shall be considered as an original, both binding and enforceable. Further, this Agreement and/or any addendum hereto may be executed and delivered in multiple counterparts (via either hard copy, electronic mail or facsimile), and each counterpart so delivered that bears the signature of a party hereto shall be binding as to such party, and all counterparts together shall constitute the original. Any party delivering this Agreement, and/or an addendum hereto, by facsimile or electronic mail shall also forthwith deliver to the other party by an internationally recognized courier service the counterpart of this Agreement and/or any addendum hereto that bears such party's original signature.

**IN WITNESS WHEREOF**, the parties hereto (or their duly authorized representatives) have affixed their signature on the date set forth below.

Accepted by:                                      Accepted by:

AMERICAN GULF FINANCE CORPORATION        MELLAND GROUP, LLC

X _____              X _____
By:    Bernd H. Weber                   By:  Robert M. West
Title    Chairman                       Title  President
Date:  October 29, 2007                 Date: October 29, 2007

Initials _____ (Interested Party)        Initials _____ (the Company)

**Exhibit E, Page 4**

## CONSULTING AGREEMENT

CONSULTING AGREEMENT (this "Agreement"), effective as of November 6, 2007, by and between Aivion Properties, Inc., Suite Two-Twenty-Two, South Main, Harrisburg, Illinois 62946, (the "Company"), and MELLAND GROUP, LLC., having its offices at 6700 SW Sandburg Street, Tigard, Oregon  97223 (the "Consultant").

WHEREAS, Consultant is a holding company with a portfolio of intellectual property pending patents (US and international) acquired through assignment and/or exclusive licensing. These financial patents offer revolutionary and innovative structures, strategies and products to the banking and finance industries and the investment community at large. Consultant's current portfolio of 18 pending patents (the "**Technology**") are grouped into four broad patent families that include more than 160 original claims that are likely to result in dozens of individual patents issued to the inventor.

WHEREAS, the Company recognizes that Consultant possesses unique capabilities and financial structuring solutions that can contribute to the growth and success of the Company and the Company desires to secure the benefits of the Consultant's advisory services to the Company for the purpose of maximizing the effectiveness of business applications that make use of the Technology;

WHEREAS, the Company on December 27, 2006 executed a Confidentiality Non-Disclosure Agreement (the "CNDA") with Consultant which is made an integral part of this Agreement;

NOW, THEREFORE, in consideration of the premises and the respective covenants and agreements of the parties herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1) <u>Consulting</u>.   The Company hereby agrees to hire the Consultant, and the Consultant hereby agrees to perform certain advisory services for the Company, on the terms and conditions set forth herein.

2) <u>Term</u>.   The term of advisory services of the Consultant by the Company hereunder shall commence as of the date hereof (the "Effective Date"), and such initial term shall end on November 5, 2008, but shall be automatically extended unless sooner terminated as hereinafter provided. Commencing on November 6, 2008, and on each anniversary thereafter (each such date an "Anniversary Date"), the term of the Consultant's advisory services shall automatically be extended for one additional year, unless the Company has given not less than 30 days notice immediately preceding an Anniversary Date (a "Non-renewal Notice") to the Consultant that it does not wish to extend the Term. References herein to the "Term" of this Agreement shall refer to both the initial term and any extended term hereunder. Notwithstanding the expiration of the Term or other termination of this Agreement, the provisions of the CNDA and Sections 3(c), 4(c), 7, 8 and 15 hereof shall survive the termination or expiration thereof.

3) <u>Nature of Advisory Services</u>.

a) <u>Positions and Duties</u>.   The Consultant shall provide consultative services to the Company and Consultant's principals, Allain de la Motte, Robert West and/or their associates, shall provide advisory services, as Advisory Directors to the Company, as would be similarly provided by a Director of the Company. Nothing contained in or inferable from this Agreement or Consultant's role with the Company or any of its subsidiaries, affiliates or New Business Models shall be construed to prevent Consultant from owning an interest in,

**Exhibit F, Page 1**

Consulting Agreement                                                    Page 2 of 12
Meiland Group, LLC & Alvion Properties, Inc.

granting licenses of its proprietary intellectual property assets in, or performing services, including, but not limited to, acting as a director and/or officer, with respect to any other business venture or third-party entity.

    b) <u>Advisory & Consulting Services</u>.  The services to be provided by Consultant to Company shall include, but are not limited to, the conceptual development of a new business models, financial structures and investment methods (together referred to as the "New Business Models") by which the Company will be able to create a means of funding its own projects with minimal "at-risk" capital.  The core strategy of the New Business Models will rest on the principal of aggregation of funds in a unit participation trust structure managed by a trustee to aggregate cash and/or illiquid equity or assets (e.g. equity in minerals that can then be leveraged) and an investment technology that will produce a return on investment that is greater than the cost of money, it being understood that the marketing of such New Business Models by the Company will be to:

Specific services to be provided by Consultant shall be, but not limited to:

    1)    Development of a master plan for New Business Models and structures that capture opportunities presented by the company or the Consultant.
    2)    Development of term sheets and structures for New Business Models that make use of components of the Technology.
    3)    Development of legal structures or a trust-directed Hedge Fund that include amongst other things a unit participation trust.
    4)    Introduction of the Company to Consultant's strategic partners including institutional trustees, custodial banks, asset managers, law firms, potential joint-venture partners, and third-party advisors, consultants and service providers to the New Business Models.
    5)    Negotiation of agreements with third-party lenders, banks, insurers, rating agencies and service providers to the New Business Models.
    6)    Assistance with Securities and Exchange Commission filings if necessary.
    7)    Facilitation of legal representation for each New Business Model opportunity.
    8)    Development of legal documents in conjunction with and/or through independently appointed legal counsel, including but not limited to the preparation of private placement memorandums or disclosure documents.
    9)    Assistance in the Development of marketing plans for the launch of New Business Models.
    10)   Negotiations of strategic alliances as and when required.
    11)   Management of the investment and/or oversight of registered asset managers hired to manage the investment of the cash pools generated by the New Business Models.

    The strategy for all New Business Models shall include amongst other things the application of certain components of Consultant's Technology made available to the Company as defined below in section 3 (d).

    c) <u>Indemnification</u>.    To the fullest extent permitted by law, the Company shall indemnify Consultant and its respective employees, directors, members, associates, agents and representatives for all amounts (including, without limitation, judgments, fines, settlement payments, losses, damages, costs and expenses, including reasonable attorneys' fees) incurred or paid by the Consultant in connection with any action, proceeding, suit or investigation arising out of or relating to the New Business Models and/or the performance

Initials (Company) _____                    Initials (Consultant) _____

                                                **Exhibit F, Page 2**

by the Consultant of services for, or acting as a consultant or advisor to, the Company or any of its subsidiaries.

c) <u>Ownership</u>. Neither this Agreement nor the transfer of any information, ideas, concepts, structures, term sheets, white papers, solutions, methods, products or system to the Company pursuant to the services provided by Consultant under this Agreement with respect of the New Business Models, shall be construed as granting by implication, estoppel, or otherwise, any rights to Consultant's Technology and or Consultant's rights to any new intellectual property. It is expressly agreed that any new ideas, concepts and/or strategies developed by Consultant during the course of providing services to the Company under this Agreement ("**New Technology**") shall remain the exclusive property of Allain de la Motte and/or Consultant as the case may be. Company hereby waives any rights or interest in any New Technology.

d) <u>License</u>. Consultant (also referred to as "**Licensor**") agrees to grant one or more limited license/s (the "**License/s**") to any new Trust structure created for the Company to market the New Business Model/s ("**Licensee**"). The License/s shall be limited in scope as defined herein and shall cover any of the intellectual property patents (the "**Patents**") and trade secrets belonging to Allain L. de la Motte (the "**Inventor**") and for which Consultant has been granted the exclusive rights in the United States and that would, in the Consultant and the Inventor's sole joint opinion and discretion, further enhance the effectiveness and profitability of the New Business Models developed for the Company. It is expressly understood that the Patents of Inventor are still pending and there are no guarantees or warranties, actual or implied, given by the Consultant or the Inventor with respect of the likelihood that such patents will be or can be successfully prosecuted. Licensor agrees that the term of the License (the "Licensing Agreement"), when issued, shall provide for the following terms and conditions:

1. The License shall specifically include a right to use specific products or services that result from patent claims of the Inventor that are deemed by Consultant to operate the New Business Model.
2. Each License shall be for an initial term of five years from the date of the License.
3. Each License shall be based on a licensing fee of $1,000 per annum payable annually in advance.
4. Each License shall be on a non-exclusive basis.
5. Each License shall be for the geographical territory of the United States only.
6. Each License may contain restrictions and limitations imposed by Licensor with respect of the channels of distribution, regional distribution, market segments or the area of business applicable to the License.
7. The total profit sharing payable to Consultant and/or Licensor under this Agreement as well as the Licensing Agreement shall not exceed the sum of the Profits due to Consultant under section 4 (c) below.
8. Each License shall automatically terminate when this Agreement is terminated for any reason whatsoever.

4) <u>Compensation and Related Matters</u>.

a) <u>Initial Retainer and Licensing Fee</u>. Upon execution of this Agreement, upon presentation of an invoice from Consultant, the Company shall pay or cause to be paid to Consultant a non-refundable one-time retainer and licensing fee of $101,000 (the "**Retainer**") for the engagement of Consultant whereupon Consultant shall provide consulting services to the Company pursuant to the terms and conditions of this Agreement.

Initials (Company) _____                    Initials (Consultant) _____

**Exhibit F, Page 3**

Consulting Agreement                                                      Page 4 of 12
Melland Group, LLC & Alvion Properties, Inc.

b) <u>Consulting Fee and Expenses</u>.  On the Effective Date of this Agreement, along
with the Retainer Invoice, Consultant shall invoice Company for a one-time consulting fee
("**Consulting Fee**") as well as anticipated related and other expenses, including travel, for a
total of $294,000. The Consultant shall not submit further invoices for consulting related
expenses and travel expenses except by prior agreement with Company.

Compensation of the Consultant by Company payment of this one-time fee shall not
be deemed exclusive and shall not prevent the Consultant from participating in any other
compensation or form of licensing arrangement from or with the Company.

c) <u>Profit Participation – Class "C" Trust Notes</u>.   Consultant/Licensor shall be entitled
to receive a profit participation share equal to fifty percent (50%) of the pretax income
("**Profits**") earned by any unit participation trust created by the Consultant on behalf of the
Company contemplated herein, whether such Profits are paid as dividends or held as
retained earnings and whether paid in cash or in any other form or consideration (Trust
Class "C" Notes, will be issued by the Trust, 50% to Company and 50% to Licensor).

Consultant's Profit sharing entitlement hereunder shall be applicable for all pre-tax income
over and above the Hurdle Rate of 12.0 % (twelve percent), paid to the Trust Class "A" Note
Holders, and shall become due and payable no later than ten (10) business days following
the close of each fiscal cycle (month or quarter as defined under both a Participation
Agreement and a Trust Agreement).  For purposes of this section, "Pretax Income" shall
mean the pretax income of the unit participation trust created for the Company for the year,
as reflected in the Trust's Statement of Income prepared in accordance with Generally
Accepted Accounting Principles ("GAAP") and consistent with prior practice.

d) <u>Company Reimbursement – Class "B" Trust Notes</u>.    The Trust Fiduciary shall
issue to Company, Class "B" Trust Notes in US Dollar units which shall reflect the total
payments made by the Company up and to the formation of the Trust, including all
payments for Consultant's services and expenses, as well as other related expenses
including those expended by Company prior to the execution of this Agreement (for the
purpose of establishing ownership, valuation of assets, and other necessary due diligence
information necessary to a Trust's launch) as well as legal, trustee, custodian, tax counsel,
rating agency, etc, (the "Trust Formation Expenses"). The Class "B" Trust Notes shall be
retired upon reimbursement to Company of two times the total Trust Formation Expenses
paid by Company.  The Consultant shall not object to the Trust Fiduciary retiring the Class
"B" Trust Notes prior to making distributions to Consultant and Company for their respective
Class "C" Trust Notes interest in the remaining Trust's investment profits earned in any fiscal
cycle. Distributions from Trust investment profits for Class "A", Class "B", and Class "C" Note
Holders will be defined in a Participation Agreement between Licensor and Company prior to
the placement of assets of Company in the unit participation trust.

e) <u>Payment for Pre-Existing Support Material</u>.  Consultant has produced prior to the
effective date of this Agreement, along with it's legal counsel, various legal document
templates which may be modified or adapted to support the implementation of any New
Business Model developed for the Company, and the Company agrees that Consultant may
charge the Company a one time fee of $135,000 which represents no more that 50% of
Consultant's original cost to develop the set of documents necessary to give effect to this
New Business Model.  This amount shall be billed to Company only after Company's CFO and

Initials (Company) _____                    Initials (Consultant) _____

**Exhibit F, Page 4**

Consulting Agreement                                                           Page 5 of 12
Melland Group, LLC & Alvion Properties, Inc.
_____

Consultant have met with Consultant's legal counsel in their New York City offices. It is
expressly agreed that any work of Consultant to adapt or modify such material to a new
Trust for the Company shall be billed the same amount billed Consultant by its legal counsel.

    f) <u>Reimbursement of Legal Fees</u>.    Any legal or other work produced by law firms
providing support for the implementation and launch of a New Business Model may be paid
by Consultant under a master service agreement with the service provider and invoiced back
to the Company when supported by a copy of the invoice received by Consultant.
Consultant shall obtain the prior written approval of the Company for any legal expenses
that might be provided in connection with the New Business Models.

5) <u>Termination</u>.    The Consultant's advisory services hereunder may be terminated without
breach of this Agreement only under the following circumstances:

    a) <u>Termination by Company by Non-renewal Notice</u>.    The Company may terminate
Consultant's engagement: (i) at the end of the Term by providing Consultant with a Non-
Renewal Notice pursuant to the requirements set forth in Section 2, or, (ii) at any time, upon
receipt by the Consultant of the Company's written notice delivered by registered mail with
return receipt requested that it is abandoning any and all plans to, directly or indirectly,
execute the launch of the New Business Models developed by Consultant for the benefit of
the Company.

    b) <u>Termination by the Consultant; Change in Control</u>.

      i) The Consultant may terminate its advisory services hereunder for "Good
Reason." For purposes of this Agreement, Consultant shall have "Good Reason" to terminate
its advisory services hereunder: (a) upon a failure by the Company to comply with any
material provision of this Agreement that has not been cured within ten business days after
a notice of noncompliance has been given by the Consultant to the Company, or (b) for any
reason whatsoever within one year following the occurrence of a Change in Control of the
Company.

      ii) For purposes of this Agreement, a "Change in Control" shall be deemed to
have occurred if:

        (1) any "person," as such term is used in Sections 13(d) and 14(d) of the
Securities Exchange Act of 1934, as amended (the "Exchange Act") (other than (1)
any trustee or other fiduciary holding securities under an employee benefit plan of
the Company, or (2) any "person" beneficially owned, directly or indirectly, by the
stockholders of the Company in substantially the same proportion as their ownership
of shares), is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the
Exchange Act ), directly or indirectly, of securities of the Company representing more
than the combined Company stock holdings of 51% of the issued and outstanding
shares (or any affiliates thereof);

        (2) Allain de la Motte or Robert West cease to hold a non-executive, advisory
director position on the Board of Directors with the entity established by the
Company to market a New Business Model;

        (3) the stockholders of the Company approve a merger or consolidation of the
Company or any entity created to implement the New Business Models with any other
corporation; or

Initials (Company) _____                              . Initials (Consultant) _____

**Exhibit F, Page 5**

(4) the stockholders of the Company approve a plan of complete liquidation of the Company or any entity created to implement the New Business Models or enter into an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets (or any transaction having a similar effect).

c) <u>Termination by the Company after November 5, 2008 by other than Non-Renewal Notice Required by Section 2</u>.    The Company shall have the option after November 5, 2008 to terminate the Term of Consultant's advisory services by providing Consultant with at least 30 day's written notice of termination. This Agreement may not be terminated by the Company prior to November 5, 2008, except for willful misconduct, fraud or gross negligence of Consultant as finally adjudicated by a court of law.

d) <u>Notice of Termination</u>.    Any termination of the Consultant's advisory services by the Company or by the Consultant shall be communicated by written Notice of Termination to the other party hereto in accordance with Section 12 hereof. For purposes of this Agreement, a "Notice of Termination" shall mean a notice that shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Consultant's advisory services under the provision so indicated.

e) <u>Date of Termination</u>.    "Date of Termination" shall mean the later of the date allowed under the terms of this Agreement or, if within thirty (30) days after any Notice of Termination is given the party receiving such Notice of Termination notifies the other party that a dispute exists concerning the termination, the date on which the dispute is finally determined, either by mutual written agreement of the parties or by a binding and final arbitration award.

6) <u>Compensation upon Termination</u>.

a) <u>Termination by the Company by Non-Renewal Notice</u>.    If the Company terminates Consultant's advisory services by providing a Non-renewal Notice pursuant to section 5 (a) hereof, then,

i) as soon as practicable thereafter, the Company shall pay the Consultant, all unpaid amounts, if any, to which Consultant was entitled to under Section 4 hereof through the Date of Termination and shall pay to the Consultant in accordance with the terms of the applicable plan or program, all other unpaid amounts to which Consultant was then entitled under the Consultant's Pro Rata Profit Participation, as defined in Section 4 (b) hereof;

ii) the payment of Profits to Consultant shall survive the termination of this Agreement for any reason whatsoever. The Company shall continue to pay Profits to Consultant for the duration of any License, or Consultant's Beneficiary, as provided in section 4(c) hereof as long as any New Business Models uses the Technology of the Consultant or the Inventor;

iii) the Company shall reimburse the Consultant for costs and other expenses incurred by the Consultant (including attorneys' fees) in connection with its termination, including costs and other expenses that may be incurred in enforcing its rights hereunder.

Initials (Company) _____          Initials (Consultant) _____

**Exhibit F, Page 6**

Consulting Agreement                                                    Page 7 of 12
Melland Group, LLC & Alvion Properties, Inc.

     b) <u>Termination for Good Reason</u>.    If the Consultant terminates its engagement for
Good Reason, then:

        i) the Company shall pay the Accrued Obligations and Pro Rata Profit
Participation to the Consultant at the time(s) set forth in Section 6(a)(i) hereof;

        ii) the Company shall reimburse the Consultant for costs and other expenses
incurred by the Consultant (including attorneys' fees) in connection with his
termination of advisory services, including costs and other expenses incurred in
enforcing its rights hereunder.

        iii) the Company shall continue to pay Profits due Consultant so long as any
New Business Models of the Company uses the Technology of the Company or the
Inventor

     c) <u>Termination by the Company after November 5, 2008 other than by Non-renewal
Notice Required by Section 2</u>.    If the Company terminates the Term of Consultant's
advisory services prior to the end of Consultant's Term pursuant to Section 5 (c), then:

        i) the Company shall pay the Accrued Obligations and Profit Participation
Bonus to the Consultant at the time(s) set forth in Section 6(a)(i) hereof;

        ii) the Company shall reimburse the Consultant for costs and other expenses
incurred by the Consultant (including attorneys' fees) in connection with his
termination of advisory services, including costs and other expenses incurred in
enforcing its rights hereunder.

7) <u>Non-Disclosure of Proprietary Information</u>.

     a) For purposes of this Agreement, the term "Proprietary Information" includes all
information concerning Consultant's Technology and respective parties trade secrets,
patents, pending patents, the identity and preference of Company's customers to the extent
that such information is a valuable component of Company's and Consultant's business, is
identified as proprietary and is not generally ascertainable by parties unaffiliated with
Consultant and Company, which has been specifically addressed in the Confidentiality and
Non-Disclosure Agreement executed by Consultant and Company as of December 27, 2006.

     b) Consultant and Company acknowledge and agree that, during the Term of this
Agreement, by reason of each parties respective position, each will have the opportunity and
obligation to become familiar with Proprietary Information belong to the other. Consultant
and Company acknowledge and agree that the knowledge of the Proprietary Information
compromises a valuable business asset of the Consultant and the Company. Each party
further acknowledges and agrees that Company intends to enhance the value of its own
business through extensive investments in new business development efforts and Consultant
will help accomplish this goal. Consultant and Company acknowledge and agree that both
parties have a legitimate interest in protecting Proprietary Information from
misappropriation or diversion by either party.

8) <u>Non-competition</u>.    During the term of this Agreement, provided Company has not
breached or defaulted in the performance of any of its obligations to Consultant or Licensor,
Consultant shall not, directly or indirectly, either as an employee, employer, consultant,
agent, principal, partner, stockholder (other than a publicly traded company), corporate

Initials (Company) _____                          Initials (Consultant) _____

**Exhibit F, Page 7**

Consulting Agreement                                                  Page 8 of 12
Melland Group, LLC & Alvion Properties, Inc.

officer, director, or in any other individual or representative capacity, engage or participate in any business that is in direct competition with the Company's current business as it existed at time of this Agreement, without the Company's prior written consent.  Nothing contained herein shall however preclude Consultant from engaging in any business activity or investment whatsoever that pertains to, results from, or is in connection with the development, licensing, launch, exploitation, utilization, development, operation or use of its intellectual property asset and any derivative products, processes, systems or methods resulting therefrom.

9) Successors; Binding Agreement.

    a)    The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company, by agreement in form and substance reasonably satisfactory to the Consultant, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.

    b)    Failure of the Company to obtain such assumption and agreement prior to the effectiveness of any such succession shall be a breach of this Agreement and shall entitle the Consultant to compensation from the Company in the same amount and on the same terms as he would be entitled to hereunder if he terminated his employment for Good Reason, except that for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination. As used in this Agreement, "Company" shall mean the Company as herein before defined and any successor to its business and/or assets as aforesaid that executes and delivers the agreement provided for in this Section 11 or which otherwise becomes bound by all the terms and provisions of this Agreement by operation of law.

    c)    This Agreement and all rights of the Consultant hereunder shall inure to the benefit of and be enforceable by the Consultant's legal representatives, executors, administrators, successors, heirs, legatees and assigns. If the Consultant ceases operation while any amounts are still due and payable to it under this Agreement, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Inventor or his devisee, legatee, or trustee (any of which is referred to herein as a "Beneficiary").

10) Notice.    For the purposes of this Agreement, notices, demands and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered or (unless otherwise specified) mailed by United States certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

If to the Company:

Alvion Properties, Inc.
c/o
Weber, Krapp & Kollegen Steuerberatungsgesellschaft mbH
Bahnhofstrasse 18
D-59929 Brilon
Germany
Attn: Bernhard H. Weber, Chief Financial Officer

Initials (Company) _____            Initials (Consultant) _____

**Exhibit F, Page 8**

If to the Consultant:

Melland Group, LLC
6700 SW Sandburg Street
Tigard, Oregon 97223
Attn: Robert M. West, President

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

11) Miscellaneous.   No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by the Consultant and such officer of the Company as may be specifically designated by the Board. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be per formed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this Agreement.

12) Validity.   The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

13) Laws Applicable to Construction.   The interpretation, performance and enforcement of this Agreement and all rights and obligations of the parties hereunder shall be governed by the laws of the State of Oregon without regard to conflict of laws principles.

14) Arbitration.   Except as set forth in Section 8(b) hereof, any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration, conducted before a panel of three arbitrators in the city of Portland, Oregon, or in such other location as may be agreed upon by the parties, in accordance with the rules of the American Arbitration Association then in effect; provided, however, that the Consultant shall be entitled to seek specific performance of its right to be paid until the Date of Termination pending the resolution of any dispute or controversy arising under or in connection with this Agreement.  The verdict rendered by the panel of arbitrators shall be final and binding and may be enforced in any court of competent jurisdiction.  In the event of a dispute, the following procedures shall apply:

(a)   A written notice shall be sent (by registered mail with return receipt requested) by the aggrieved Party to the Party in default, which shall include an explicit and detailed statement of the dispute.  The Party being served the notice shall have fifteen (15) business days to respond in writing and/or to cure the default.  If the Parties fail to resolve the dispute within the fifteen business day period, the matter will be submitted to arbitration as follows.

(b)   The Parties agree that any controversy or claim arising out of or relating to this Agreement or breach thereof, and which is not settled between the Parties, shall be settled by arbitration in accordance with the rules of conciliation and arbitration of the American Arbitration Association.   Arbitration proceedings shall be directed by three arbitrators, one appointed by each Party and the third subsequently appointed by the first

Initials (Company) _____        Initials (Consultant) _____

two arbitrators.  The arbitrators for any arbitration proceeding referred to herein shall be chosen as follows:  (a) one shall be chosen by the Party seeking arbitration, (b) one shall be chosen by the other Party hereto and (c) one shall be chosen by the two arbitrators selected hereunder.  The arbitrators to be chosen by the Parties shall be chosen within 30 days of the service of a demand for arbitration on any of the Parties.  If the two arbitrators appointed above shall not agree to the appointment of the third arbitrator to be appointed as provided herein, such third arbitrator shall be chosen by the then President of the Association of the Bar of the City of  Portland, Oregon, subject to challenge by any party only by reason of a conflict of interest.  The Parties agree to have the dispute arbitrated in accordance with said rules of arbitration. The arbitration proceedings shall be held in the City of Portland, Oregon, or any other location mutually agreed in writing by the Parties.  Failure to appear, without a showing of good cause, shall entitle the other Party to an award.

(c)     The decision and award made by the arbitrators shall include the award of all costs and expenses including attorney's fees and expenses, incurred by the aggrieved Party as a result of the dispute. Any such award shall be paid to the prevailing Party by the unsuccessful Party within thirty (30) days after the award.  In the event of circumvention, either directly or indirectly, or any other dispute arising out of, or relating to this Agreement, the aggrieved Party shall be entitled to monetary compensation equal to the maximum fee, commission, remuneration, consideration, or benefit it would have received from such Transaction, and such other damages and relief as may be deemed appropriate. The sum allowed and relief granted shall he paid and become due and payable within the thirty (30) day period required for the payment of fees and expenses, unless otherwise specified in the arbitration decision. Settlement upon an award shall be final, and may be entered in any court of competent jurisdiction.

15) <u>Remedies</u>.  The Parties hereto agree that, in the event that a Party commits a breach, or threatens to commit a breach of this Agreement, the non-breaching Party shall have the following rights and remedies:

a)     Each breaching Party hereby consents to a grant of an injunction restraining any violation or threatened violation of the terms of this agreement of the Confidentiality Agreement or any other appropriate decree of specific performance by any court having equity jurisdiction, it being acknowledged and agreed by each breaching Party hereto that the services rendered, and to be rendered by the non-breaching Party, pursuant to this Agreement are of a special, unique and extraordinary character and that any such breach or threatened breach will cause irreparable injury to the non-breaching Party and that money damages will not provide an adequate remedy to the non-breaching Party; and

b)     to require each breaching Party to account for and pay over to the non-breaching Party all compensation, profits, monies, accruals, increments or other benefits (collectively "Benefits") derived or received by each breaching Party as the result of any transactions constituting a breach of any of the provisions of this Agreement and the Confidentiality Agreement, and each breaching Party hereto hereby agrees to account for and pay over such Benefits to the non-breaching Party.

Each of the rights and remedies enumerated in this Section 6.12 shall be independent of the other, and shall be severally enforceable, and such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available at law or in equity.

16) <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement of the parties hereto in respect of the subject matter contained herein and supersedes any and all other prior

Initials (Company) _____

Initials (Consultant) _____

Consulting Agreement                                                              Page 11 of 12
Melland Group, LLC & Alvion Properties, Inc.

agreements, promises, covenants, arrangements, communications, representations or
warranties, whether oral or written, by any officer, employee or representative of any party
hereto; and any prior agreement of the parties hereto in respect of the subject matter
contained herein is hereby terminated.

17) Facsimile Copies and/or Counterparts:  Should this Agreement or any subsequent
Addendum be transmitted by facsimile or electronic mail, the signed facsimile of e-mail
document shall be considered as an original, both binding and enforceable.  Further, this
Agreement and/or any Addendum hereto may be executed and delivered in multiple
counterparts (via either hard copy, electronic mail or facsimile), and each counterpart so
delivered that bears the signature of a Party hereto shall be binding as to such Party, and all
counterparts together shall constitute the original.  Any Party delivering this Agreement,
and/or addendum hereto, by facsimile or electronic mail shall also forthwith deliver to the
other Party by an internationally recognized overnight courier service the counterpart of this
Agreement and/or any addendum hereto that bears such Party's original signature.

18) Assignment of New Inventions. The Company hereby waives any rights, title and interest
in any new inventions that are developed as a result of the application of the Technology of
Inventor to any New Business Model or work performed by Consultant for the Company
pursuant to this Agreement.  The Company hereby assigns to the Inventor or its designee,
any and all rights, title, and interest in and to any and all improvements, new inventions,
original works of authorship, developments, concepts, or trade secrets, whether or not
patentable or registrable under copyright or similar laws, which it may conceive or develop
or reduce to practice, or cause to be conceived or developed or reduced to practice, during
the Term of this Agreement (collectively referred to as "**Inventions**").

19) Assistance of Company.  The Company agrees to assist Inventor, or its designee, at the
Consultant's or Inventor's expense, in every proper way to secure the Inventor's rights in
any Inventions, as well as any copyrights, trademarks, or other intellectual property rights
relating thereto in any and all countries, including the execution of all applications,
specifications, oaths, assignments and all other instruments which the Consultant or the
Inventor shall deem necessary in order to apply for and obtain such rights and in order to
assign and convey to the Inventor, its successors, assigns and nominees the sole and
exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, or
other intellectual property rights relating thereto.  The Company further agrees that its
obligation to execute or cause to be executed, when it is in its power to do so, any such
instrument or papers shall continue after the termination of this Agreement.  The Company
hereby irrevocably designates and appoints Inventor as its duly authorized agent and
attorney in fact, to act for and on its behalf and stead to execute and file any such
applications and to do all other lawfully permitted acts to further the prosecution and
issuance of patent, trademark or copyright registrations thereon with the same legal force
and effect as if executed by the Company.

20) Headings.  Paragraph headings contained in this Agreement are included for convenience
only and are not part of the Agreement between the Parties;

### THE REST OF THIS PAGE IS LEFT BLANK INTENTIONALLY

Initials (Company) _____                     Initials (Consultant)_____

**Exhibit F, Page 11**

Consulting Agreement                                          Page 12 of 12
Melland Group, LLC & Alvion Properties, Inc.

**SIGNATURE PAGE**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year
first above written.

Alvion Properties, Inc.

By: _____

Bernhard H. Weber, Chief Financial Officer

Melland Group, LLC

By: _____

Robert M. West
Title: Managing Member/President

**Read & Acknowledged**

_____          Date: November 6, 2007
Allain de la Motte, Inventor

Initials (Company) _____          Initials (Consultant) _____

**Exhibit F, Page 12**

# CONFIDENTIALITY, NON-DISCLOSURE AND NON-UTILIZATION AGREEMENT

THIS CONFIDENTIALITY, NON-DISCLOSURE, AND NON-UTILIZATION AGREEMENT (this "Agreement"), dated as of January 24, 2008, (the "Effective Date") is made by and between Melland Group, LLC, an Oregon limited liability company located at 6700 SW Sandburg Road, Tigard, Oregon 97223 (the "Company") and

| | |
|---|---|
| Name: | Deloitte & Touche LLP |
| Address: | 1W/16/42 |
| | 1 World Financial Center |
| City, State, Zip: | New York, NY 10281-1003 |

(the "Interested Party") with reference to the following:

## RECITALS

WHEREAS, the Company wishes to discuss with the Interested Party the possibility of the Interested Party providing certain services to the Company  (the "Discussions"); and

WHEREAS, in order to conduct such Discussions , the Company may disclose Confidential Information (as defined herein) to the Interested Party;

NOW, THEREFORE, and in consideration of the foregoing premises, and the mutual promises and undertakings contained herein, the parties hereto agree as follows:

## AGREEMENT

1.    **Definitions.**

1.1    **"Confidential Information,"** as used herein, shall mean information of, entrusted to, or in the possession of the Company and disclosed to the Interested Party by the Company or any third party for or on behalf of the Company in connection with the Discussions, orally or in writing, and which is not generally made available to the public at large, including but not limited to the concepts and business practices of the Company and any potentially related services (hereinafter jointly referred to as the **"Program"**) and all plans and proposals relating to the Program, all Program-related contracts, forms and procedures, all Program-related vendor relationships, financial data, costs, margins, software, computer programming, mailing or other marketing lists, customer lists, sources of supply, information concerning employees, any advertising, promotion products or any other information of a proprietary or non-public nature.  Confidential Information specifically related to the Technology shall also include information of the Company of a strategic, financial, technical, research, marketing, operational and/or performance nature, and shall further include trade secrets, roll-out and implementation plans, cost know-how, pricing methodology, projections, software design, computer systems, demonstration programs, routines, algorithms, data systems and databases, techniques, methodologies, designs, procedures, formulas, inventions, discoveries, improvements, concepts, records, files, memoranda, reports, drawings, diagrams, charts, data tables, plans, customer lists, information relating to past, present, and/or future clients, information relating to any research, development, business activities and strategic development plans.

1.2    **"Reasonable Care"** as used herein shall mean the same degree of care exercised by any prudent person with respect to information of a confidential  nature.

2.    **Obligations of Interested Party.** The parties agree that the Interested Party as recipient of Confidential Information shall upon receipt and thereafter:

Initials _____ (Interested Party)                    Initials _____ (the Company)

**Exhibit G, Page 1**

     2.1    Use Reasonable Care to maintain the confidentiality of such Confidential Information and limit its disclosure to such of its directors, officers, personnel, affiliates, related entities or representatives (collectively, "Involved Parties") as have a need to know in connection with the Discussions;

     2.2    Require its Involved Parties who receive disclosures of the Confidential Information to abide by this Agreement, and sign it if the Involved Party is not an employee, partner, principal, affiliate or related entity of the Interested Party, and require all Involved Parties who leave the Interested Party's employ to return any and all Confidential Information, provided that the Interested Party will be responsible for the disclosure, use or other treatment of Confidential Information by any and all Involved Parties, and, in case there is a breach by any or all of the Involved Parties, the Interested Party will be liable to the Company;

     2.3    Not duplicate or distribute the Confidential Information for any purpose other than as provided in Section 2.1 above;

     2.4    Not use any Confidential Information for any purpose than provided for in 2.1 and 2.2 without the prior written approval of the Company;

     2.5    Not discuss or disclose Confidential Information except as authorized by this Agreement or except as expressly authorized by the Company;

     2.6    Except as required by law, rule or regulation or judicial or administrative process, not disclose to third parties that it has possession of any of the Confidential Information, or disclose to same that it is contemplating participation in the Program; and

     2.7    Not contact, without the Company's prior written consent, any third party, including any vendors or the Company, to discuss any Confidential Information. (Nothing herein shall prevent the Interested Party from contacting the representative of the Company with questions on Confidential Information.)

     3.    **Term of Agreement.** This Agreement and the obligations set forth herein shall continue until the earlier of (i) the parties' execution of an agreement for services in connection with the Discussions, or (ii) five (5) years from the Effective Date.

     4.    **Exceptions to Interested Party's Obligations.** The obligations of an Interested Party under this Agreement shall not apply to:

     4.1    Information that is available or becomes available to the general public without restriction through no breach of this Agreement by the Interested Party;

     4.2    Information received from a third party which the Interested Party reasonably believes has the right to transfer said information;

     4.3    Information that is independently developed by the Interested Party without reference to Confidential Information; or

     4.4    Disclosed pursuant to a subpoena or order of a court, agency or government authority of competent jurisdiction, or as required by law, rule or regulation, provided that the Interested Party shall, to the extent permitted thereunder, promptly notify the Company of and permit the Company to contest any such requirement.

     5.    **Return of Confidential Information.** Upon written request of the Company, the Interested Party shall promptly return to the Company any and all tangible material containing Confidential Information, including any copies thereof and shall confirm that all such documents have been returned. Upon such request, the Interested Party shall make no further use or disclosure of any Confidential Information.

Initials _____ (Interested Party)                    Initials _____ (the Company)

**Exhibit G, Page 2**

6.    **Warranties.** The Company warrants that it has the right to disclose to the Interested Party Confidential Information under the terms and conditions of this Agreement and that to do so does not violate any obligations to any third party. ALL OTHER WARRANTIES ARE DISCLAIMED, INCLUDING THAT ANY INFORMATION IS FIT FOR A PARTICULAR PURPOSE OR MERCHANTABLE. Without limiting the preceding sentence, the parties make no warranty as to the accuracy or completeness of any information, which may be provided. The Interested Party shall rely solely on its own analysis in determining whether to proceed with any transaction to which such information may pertain.

7.    **Proposal. .** The Company agrees that any proposal submitted by the Interested Party in connection with the Discussions (the "Proposal") shall be used by the Company solely to evaluate the Proposal.  The Company shall protect the Proposal from disclosure to third parties, exercising at least the same degree of care as the Company employs in maintaining as secret its own trade secret, proprietary and confidential information, but always at least a reasonable degree of care.  The Company shall have no obligations of confidentiality with respect to any information, materials or professional tax advice relating to tax services, tax transactions or the tax treatment of any tax structure or transactions as described in Rule 3501(c)(i) of Public Company Accounting Oversight Board Release 2005-014 and Internal Revenue Code sections 6011 and 6111 and related Internal Revenue guidance.

8.    **Incorporation of Confidential Information in Other Documents.** In the event that Confidential Information shall be incorporated into other documents, whether separately or jointly generated by the parties, such other documents shall to the extent of such Confidential Information be deemed Confidential Information subject to the terms of this Agreement.

9.    **Injunctive Relief.** The Interested Party acknowledges that it has been informed that the Confidential Information has been developed by the Company with substantial effort and at substantial cost and, therefore, has value to the Company, and that breach of any of the provisions of this Agreement could cause the Company irreparable injury for which no adequate remedy at law may exist. Accordingly, the Company shall have the right, in addition to any other rights it may have to seek the entry in any court having jurisdiction of a temporary or permanent restraining order or injunction restraining or enjoining the Interested Party from any violation of this Agreement..

10.    **Modification.** This Agreement may only be modified in writing executed by both parties.

11.    **Governing Law.** This Agreement and matters connected with the performance thereof shall be construed, interpreted, applied and governed in all respects in accordance with the laws of the United States of America and the State of Oregon, without reference to conflict of laws principles.

12.    **Jurisdiction.** The Parties agree that all disputes and litigation regarding this Agreement and matters connected with its performance shall be subject to the exclusive jurisdiction of the courts of the State of Oregon in the United States of America or of the Federal courts sitting therein.

13.    **Facsimile Transmissions.** Should this Agreement or any subsequent addendum be transmitted by facsimile or electronic mail, the signed facsimile document shall be considered as an original, both binding and enforceable.  Further, this Agreement and/or any addendum hereto may be executed and delivered in multiple counterparts (via either hard copy, electronic mail or facsimile), and each counterpart so delivered that bears the signature of a party hereto shall be binding as to such party, and all counterparts together shall constitute the original.  Any party delivering this Agreement, and/or an addendum hereto, by facsimile or electronic mail shall also forthwith deliver to the other party by an internationally recognized courier service the counterpart of this Agreement and/or any addendum hereto that bears such party's original signature.

Initials _____ (Interested Party)                    Initials _____ (the Company)

**Exhibit G, Page 3**

Confidentiality, Non-Disclosure and Non-Utilization Agreement                    Page 4 of 5

          IN WITNESS WHEREOF, the parties hereto (or their duly authorized representatives) have affixed their signature on the date set forth below.

Accepted by:                                    Accepted by:

INTERESTED PARTY                                MELLAND GROUP, LLC

Name:  Deloitte & Touche LLP

x _Robert Fried_                                x _Robert M. West_
By:    Robert Friedman                          By:    Robert West
Title    Director                               Title  President
Date:  January 24, 2008                         Date: January 24, 2008

Initials _____ (Interested Party)              Initials ____ (the Company)

                                                **Exhibit G, Page 4**



**BY HAND DELIVERY ONLY**                                    December 20, 2007

Commerce Bank, c/o
Messrs. Jose S. Cordero, Sr., Atco Manager
Mr. Carlo Chinosi, Senior Manager, and
Mr. Jim Pachelo, Senior Manager
1701 Route 70 East, Cherry Hill, NJ 08034

Re: CONFIDENTIALITY, NON-DISCLOSURE AND NON-UTILIZATION AGREEMENT

Dear Gentlemen:

In anticipation of further discussion, attached for your review please find our Confidentiality and Non-Disclosure Agreement (CNDA).

As we believe our proprietary funding strategies can bring significant financial benefit and advantage to your institution, we have chosen to be very selective with respect to the financial institutions we are negotiating with regarding our financial engineering technologies.

We very much look forward to engaging confidentially in further discussions.

Sincerely,
AGF Realty Solutions LLC


Donald H. Weber                              Donald C. Rishell
Manager                                      Manager


TEL: 609-567-6029 - FAX: 801-315-0766
CELL: 856-5772439 - WEB: WWW.A-G-FINANCE.COM
EMAIL: AGF-REALTY-SOLUTIONS-LLC-2@A-G-FINANCE.COM
21 FOUNTAINE COURT, WATERFORD WORKS, NJ 08089 2202

**Exhibit H, Page 1**

## CONFIDENTIALITY, NON-DISCLOSURE AND NON-UTILIZATION AGREEMENT

**THIS CONFIDENTIALITY, NON-DISCLOSURE, AND NON-UTILIZATION AGREEMENT** (this "**Agreement**"), dated as of December 19, 2007, (the "**Effective Date**") is made by and between **AGF Realty Solutions LLC**, located at 21 Fountaine Court, Waterford Works, NJ 08089-2202, a Delaware limited liability company, and **Alvion Partners LLC**, c/o Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, a Delaware limited liability company, (the "**Company**") and

**Commerce Bancorp, Inc., Commerce Atrium**

1701 Route 70 East, Cherry Hill, NJ 08034-5400

(the "**Interested Party**") with reference to the following:

RECITALS

      **WHEREAS**, the Company wishes to disclose to the Interested Party certain proprietary intellectual property and business processes (the "**Technology**") that includes, amongst other things, patent-pending systems and methods that pertain to various finance-related or profit generation activities, balance sheet enhancement technologies, pending patents, trade secrets and proprietary systems, methods and processes belonging to the Company or to third-party inventors; and

      **WHEREAS**, in order to conduct such discussions and any subsequent negotiations between the parties, the Company may disclose Confidential Information (as defined herein) to the Interested Party;

      **NOW, THEREFORE**, for and in consideration of the foregoing premises, and the mutual promises and undertakings contained herein, the parties hereto agree as follows:

AGREEMENT

      1.    **Definitions.**

        1.1    "**Confidential Information**," as used herein, shall mean information of, entrusted to or in the possession of the Company and disclosed to the Interested Party by the Company or any third party for or on behalf of the Company, orally or in writing, and which is not generally made available to the public at large, including but not limited to the concepts and business practices underlying the Technology and any potential related services (hereinafter jointly referred to as the "**Program**") and all plans and proposals relating to the Program, all Program-related contracts, forms and procedures, all Program-related vendor relationships, financial data, costs, margins, software, computer programming, mailing or other marketing lists, customer lists, sources of supply, information concerning employees, any advertising, promotion products or any other information of a proprietary or non-public nature. Confidential Information specifically related to the Technology shall also include information of the Company's of a strategic, financial, technical, research, marketing, operational and/or performance nature, and shall further include trade secrets, roll-out and implementation plans, cost know-how, pricing methodology, projections, software design, computer systems, demonstration programs, routines, algorithms, data systems and databases, techniques, methodologies, designs, procedures, formulas, inventions, discoveries, improvements, concepts, records, files, memoranda, reports, drawings, diagrams, charts, data tables, plans, customer lists, information relating to past, present, and/or future clients, information relating to any research, development, business activities and strategic development plans.

        1.2    "**Reasonable Care**" as used herein shall mean the same degree of care exercised by any prudent person with respect to information of a highly sensitive nature.

Initials _____ (Interested Party)                    Initials _____ (the Company)

**Exhibit H, Page 2**

**2.    Obligations of Interested Party.** The parties agree that the Interested Party as recipient of Confidential Information shall upon receipt and thereafter:

**2.1**    Use Reasonable Care to maintain the confidentiality of such Confidential Information and limit its disclosure to such of its directors, officers, employees or representatives as have a need to know such Confidential Information in order to evaluate and, if appropriate, implement the Company's participation in the Program;

**2.2**    Require its directors, officers, employees or representatives to execute an agreement with provisions similar to this Agreement;

**2.3**    Not duplicate or distribute the Confidential Information for any purpose other than as provided in Section 2.1 above;

**2.4**    Not use any Confidential Information for any purpose without the prior written approval of the Company;

**2.5**    Not discuss or disclose Confidential Information except as authorized by this Agreement or except as expressly authorized by the Company;

**2.6**    Not disclose to third parties that it has possession of any of the Confidential Information, or disclose to third parties that it is contemplating participation in the Program; and

**2.7**    Not contact, without the Company's prior written consent, any employees of or consultants to, the Company, or any other third party, including any vendors or the Company, to discuss any Confidential Information. (Nothing herein shall prevent the Interested Party from contacting the representative of the Company with questions on Confidential Information.)

**3.    Term of Agreement.** The term of this Agreement is five (5) years from the Effective Date. All of the provisions of this Agreement shall survive the return of the Confidential Information to the Company pursuant to Section 5.

**4.    Exceptions to Interested Party's Obligations.** The obligations of an Interested Party under this Agreement shall not apply to Confidential Information of the Company to the extent it is:

**4.1**    Information that is available or becomes available to the general public without restriction through no wrongful act or omission of the Interested Party;

**4.2**    Information received from a third party having the right to transfer said information;

**4.3**    Information that is independently developed by the Interested Party without reference to Confidential Information; or

**4.4**    Disclosed pursuant to a subpoena or order of a court, agency or government authority of competent jurisdiction which is binding on the Interested Party provided that the Interested Party shall, to the extent permitted thereunder, immediately notify the Company of and permit the Company to contest any such subpoena or order.

**5.    Return of Confidential Information.** Upon request of the Company, the Interested Party shall immediately return to the Company any and all tangible material containing Confidential Information, including any copies thereof and shall represent and warrant that all such documents have been returned. The Interested Party shall make no further use or disclosure of any Confidential Information.

Initials _____ (Interested Party)            Initials _____ (the Company)

**Exhibit H, Page 3**

**6.** **Non-Utilization.** Both parties acknowledge and agree that they have not been given permission by the other party to utilize any Confidential Information in any way, including, but not limited to, implementing the Program or developing any product or service substantially similar to the Program and that any right to utilize the Confidential Information in providing services and/or products to third parties shall only be pursuant to a subsequent written agreement of the parties. Neither this Agreement nor the transfer of any information hereunder, shall be construed as granting by implication, estoppel, or otherwise, any rights to the Technology.

**7.** **Warranties.** The Company warrants that it has the right to disclose to the Interested Party Confidential Information under the terms and conditions of this Agreement and that to do so does not violate any obligations to any third party. ALL OTHER WARRANTIES ARE DISCLAIMED, INCLUDING THAT ANY INFORMATION IS FIT FOR A PARTICULAR PURPOSE OR MERCHANTABLE. Without limiting the preceding sentence, the parties make no warranty as to the accuracy or completeness of any information, which may be provided. The Interested Party shall rely solely on its own analysis and expertise in determining whether to proceed with any transaction to which such information may pertain. None of the information which may be disclosed regarding the Technology shall constitute any representation, warranty, assurance, guarantee, or inducement of any kind, and, in particular, with respect to the non-infringement of licenses, patents, trademarks, copyrights, trade secrets or any intellectual property rights, or other right of third persons.

**8.** **Limitation of Liabilities.** The Company shall only provide the Interested Party with copies, not originals, of the Confidential Information. In the event Confidential Information is lost, damaged, stolen or destroyed while in possession or control of the Interested Party, the Interested Party shall not be responsible for the costs of re-creating such Confidential Information.

**9.** **Incorporation of Confidential Information in Other Documents.** In the event that Confidential Information shall be incorporated into other documents, whether separately or jointly generated by the parties, such other documents shall to the extent of such Confidential Information be deemed Confidential Information subject to the terms of this Agreement.

**10.** **Injunctive Relief.** The Interested Party acknowledges that the Confidential Information has been developed by the Company with substantial effort and at substantial cost and, therefore, has value to the Company; and that breach of any of the provisions of this Agreement could cause the Company irreparable injury for which no adequate remedy at law exists. Accordingly, the Company shall have the right, in addition to any other rights it may have and, by executing this Agreement, the Interested Party hereby consents, to the entry in any court having jurisdiction of a temporary or permanent restraining order or injunction restraining or enjoining the Interested Party from any violation of this Agreement. The Interested Party further agrees to waive, and to use its best efforts to cause its directors, officers, employees and agents to waive, any requirement for the securing or posting of any bond in connection with such remedy.

**11.** **Damages.** Any breach of this agreement by the Interested Party shall render the Interested Party liable to the Company for liquidated damages in the amount of ten thousand ($10,000) dollars per breach. The Company shall have the right to seek either remedy provided in Section 10 or Section 11.

**12.** **Modification.** This Agreement may only be modified in writing executed by both parties.

**13.** **Attorney Fees.** In any proceeding to enforce or interpret any of the terms of this Agreement, the prevailing party shall be entitled to recover its costs and attorneys fees.

**14.** **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in the State of New York.

Initials _____ (Interested Party)          Initials _____ (the Company)

**15.** **Arbitration.** All disputes in connection with this Agreement or the execution thereof shall be settled through friendly negotiations. In the event that no settlement can be reached within thirty (30) days of the initial date of the dispute, either of the Parties may then submit the dispute to the American Arbitration Association sitting in New York, New York and in accordance with the Commercial Rules of the AAA. All decisions of the arbitrator shall be final and binding upon both parties. Neither party shall seek recourse in a court of law or appeal to other authorities for relief. Arbitration costs shall be borne by the losing party.

**16.** **Facsimile Transmissions.** Should this Agreement or any subsequent addendum be transmitted by facsimile or electronic mail, the signed facsimile document shall be considered as an original, both binding and enforceable. Further, this Agreement and/or any addendum hereto may be executed and delivered in multiple counterparts (via either hard copy, electronic mail or facsimile), and each counterpart so delivered that bears the signature of a party hereto shall be binding as to such party, and all counterparts together shall constitute the original. Any party delivering this Agreement, and/or an addendum hereto, by facsimile or electronic mail shall also forthwith deliver to the other party by an internationally recognized courier service the counterpart of this Agreement and/or any addendum hereto that bears such party's original signature.

**IN WITNESS WHEREOF,** the parties hereto (or their duly authorized representatives) have affixed their signature on the date set forth below.

Accepted by:

**ALVION PARTNERS LLC**

X _____

By:    Bernd H. Weber

Title    Managing Member

Date:   December 19, 2007

Accepted by:

**AGF REALTY SOLUTIONS LLC**

X _____

By:    Donald C. Rishell

Title: Manager

Date: December 19, 2007

**COMMERCE BANK**

X _____

By:   *Jose Castro*

Title   *Branch Manager*

Date:  December ___, 2007

*CARLO Carrosi*
*AVP*

**COMMERCE BANK**

X _____

By:   *James E. Pacheo*

Title:  *Vice President*

Date: December ___, 2007

Initials _____ (Interested Party)                   Initials _____ (the Company)

**Exhibit H, Page 5**