Bernd H. Weber
Suite 702
55 Kingsbridge Garden Circle
Mississauga, Ontario L5R1Y1
Tel: (905) 502-0700
Email: agfinance@a-g-finance.com
Acting As Attorney Pro Se

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | | |
|---|---|---|
| **MELLAND GROUP, LLC d/b/a nTRUST,** | ) | No. CV08-957-AC |
| **an Oregon limited liability company,** | ) | |
| **and ALLAIN DE LA MOTTE,** | ) | |
| | ) | |
| **PLAINTIFFS** | ) | |
| | ) | |
| **v.** | ) | **DECLARATION OF BERND H. WEBER IN OPPOSITION OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MOTION FOR EXPEDITED DISCOVERY** |
| | ) | |
| **BERND H. WEBER, CLAUDE J. CHAUVEAU, AMERICAN GULF FINANCE CORP., ALVION PARTNERS, LLC, WEBER, LLC, AGF REALTY SOLUTIONS, INC., ALEXON HOLDINGS INTERNATIONAL LTD., TIMEDATA CORPORATION, TIME DATA HOLDINGS, LLC, and DOES 1-10,** | ) | |
| | ) | |
| **DEFENDANTS** | ) | |

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

I, Bernd H. Weber, declare:

1. I make this declaration in opposition of Plaintiffs' Motion for Preliminary Injunction and Plaintiffs' Motion for Expedited Discovery. The following is true to the best of my knowledge, information and belief.

2. I am residing in Mississauga, Ontario, Canada, for more than 11 years and I am a German citizen.

3. I have been a financial and real estate consultant since 1978.

**FACTUAL EVENTS - MELLAND GROUP LLC- ALLAIN DE LA MOTTE**

4. In the fall of 2006, Defendant Weber was introduced by the late Mr. Ray Hatch of New York City to the President of First Choice Equities, Inc., Mr. Dennis Geraghty. Mr. Geraghty shared certain draft documents with Defendant Weber, the use of which were not restricted by any confidentiality or other agreements.

5. On December 27, 2006, upon introduction by the late Ray Hatch, Alvion Properties, Inc. ("Alvion"), represented by Defendant Bernd H. Weber in his position as Chief Financial Officer ("CFO"), entered into a Confidentiality and Non-Disclosure Agreement ("CNDA") between Melland Group LLC ("Melland") and Alvion. Disputes arising under this CNDA were to be exclusively legally settled by arbitration in New York, NY, in accordance with the rules of conciliation and arbitration of the American Arbitration Association.

6. On October 29, 2007, a mutual CNDA was executed between Melland and American Gulf Finance Corporation ("AGF"), represented by Defendant Weber in his position as Chairman. Disputes arising under this CNDA were to be exclusively legally settled by arbitration in New York, NY, in accordance with the rules of conciliation and arbitration of the American Arbitration Association.

7. On November 6, 2007, a Consulting Agreement was executed between Melland and Allain de la Motte ("ADLM") and Alvion. Disputes arising under this CNDA were to be exclusively legally settled by arbitration in Portland, Oregon, in

accordance with the rules of conciliation and arbitration of the American Arbitration Association.

8.  On November 6, 2007, an agreement for AGF Resources Trust I. was executed between Melland and AGF, which included the inducement of Alvion to raise US$1,000,000 seed capital to pay for the costs associated with the launch of the alleged above Trust. Alvion was required to pay by Melland and ADLM upfront advance fees of US$395,000.00 to Melland. To this date, Melland has not performed or rendered any valuable consideration to the project in return.

9.  On November 8, 2007, Melland appointed Defendant Weber as their Senior Vice President Project Development.

10. On December 20, 2007, Alvion paid additional fees of US$135,000.00 to Melland, now totalling US$530,000.00 in upfront advance fees, for which Alvion never received any valuable consideration by Melland/ADLM. In fact, ADLM and/or Melland provided or returned nothing of value for these substantial upfront fees.

11. On February 8, 2008, Defendant Claude J. Chauveau ("Defendant Chauveau") and Defendant Weber met with Seward & Kissel, (a New York City law firm claimed by Melland and ADLM as "their law firm" but whose fees were paid by Alvion) to advise the law firm of the termination, nullification and rescinding of all agreements and the termination of their respective positions with Melland.

12. On March 7, 2008, Defendant Chauveau received a letter from David Cooper alleging breach of "Melland IP". Mr. Cooper was an attorney with Kolisch Hartwell, P.C., a law firm in Portland, Oregon.

13. On March 17, 2008, Defendant Chauveau responded to David Cooper openly revealing to David Cooper:

> *"While your clients' representations appear to be bonafide on the surface, they are  masterfully designed to mislead unsuspecting parties and are so woven into an aura of legitimacy that parties who react to these presentations with their goodwill, good faith, and last but not least their good money, are incapable of seeing past these misrepresentations. At this point, I am of the opinion that your*

> *clients are nothing but crafty businessmen that successfully rely upon the goodwill and good faith of others to promote their deception, thereby causing parties who have invested in good faith into your clients to incur dramatic losses. Furthermore, I am of the opinion that your clients should be legally enjoined from making any further representations to anyone until they can successfully demonstrate and prove their ability to profitably implement their investment technology claims to avoid harming any other unsuspecting second and third parties.*"

14. On March 21, 2008, Defendant Weber nullified and rescinded all agreements on the basis of misrepresentation and fraud. Defendant Weber requested that "*Melland Group LLC immediately provides evidence that these investment platforms and trusts (that are said to be designed to achieve these outperforming returns for Investors) really exist and are not just wild-goose-chase-patent-pending-hypotheticals, designed to embezzle substantial monies from clients in order to finance these ideas, rather than the clients' own projects.*" Defendant Weber requested Melland to refund all fees received under false pretense from Alvion. Melland declined to refund any monies received.

15. On April 1, 2008, Melland in their letter to Alvion in response to the nullification letter of March 21, 2008, denied any responsibility and instead alleged numerous counter-violations of agreements without any providing any details. This is tantamount to the well-known behaviour of advance fee con artists (please see section entitled "The Advance Fee Scheme").

16. On April 4, 2008, Defendant Chauveau received another letter from David Cooper with endless repetitions of the ever same undefined allegations.

17. On April 9, 2008, Defendant Chauveau responded to David Cooper rebutting again all and any of the ever same undefined allegations.  In addition, Defendant Chauveau stated for the record:

> "*As I have never been paid a salary by your clients, never had an employment agreement with your clients, nor ever have been properly compensated for my time or efforts acting as Chief Information Officer for your clients, this letter shall also serve as my formal notice to you and your clients*

> *that I retain any and all rights of ownership or co-ownership*
> *as may be appropriate to any contributions I may have made*
> *to the Technology.* "

18. On April 11, 2008, Defendant Weber wrote a letter to Melland rebutting in detail each and every allegation and insinuation. Melland continued to refuse to define the "IP" that has allegedly been violated. This refusal ultimately resulted in the joint motion of Defendants Chauveau and Weber to request a More Definite Statement from the Plaintiffs, for which this Honorable Court has granted a hearing currently scheduled for January 15, 2009.

19. On April 12, 2008, Defendant Weber wrote another letter to David Cooper regarding David Cooper's intentional violation and circumvention of various CNDAs protecting the interests of Defendant Weber. David Cooper's unsubstantiated and inflammatory and unfounded implied accusations are tantamount to slander. David Cooper, under the direction of Melland and ADLM, irreparably damaged Defendant Weber's long-standing relationship with the former owners of Alvion and constituted tortuous interference with ongoing business relationships and contracts.

20. On April 16, 2008, Defendant Chauveau had a conference call with David Cooper to explain to David Cooper that the "IP" of his client Melland has absolutely no substance and that Cooper indeed is supporting an illegal structure and manoeuvring himself into substantial liability. Cooper was shocked and requested more time to think about the "new information". Thereafter, Cooper disappeared from the scene, just as many other lawyers have before him after they determined that Melland and ADLM had pulled wool over their eyes (see section entitled: "The Pattern With Law Firms").

21. On April 17, 2008, Defendant Weber wrote another letter to David Cooper again demanding to provide bonafide evidence of his unsubstantiated and inflammatory allegations or to issue his retraction notification. David Cooper never responded.

22. On April 18, 2008, Defendant Weber wrote a letter to Melland again requesting to retract unfounded allegations and to reimburse the upfront and advance fees paid by Alvion. Melland again declined to refund any monies.

23. On May 5, 2008, Melland responded to Alvion, Defendant Weber and Defendant Chauveau with the classical con artist pattern when the con artists recognizes that the time to perform is long over and when the con artist recognizes he

cannot possibly perform the promised tasks, with wild undefined allegations, all in an attempt to escape the responsibilities of Melland under the Consulting Agreement. Melland requested Defendant Weber and Defendant Chauveau to issue affidavits. Once again, Melland failed to define what the "IP" that was/is alleged to have been violated. While Melland claimed to cancel the relationships with Alvion in the letter, Melland asked for permission to contact Defendant Weber's client Alvion directly. Despite Defendant Weber's denial to allow Melland to contact Alvion directly, Melland and ADLM circumvented and met with the former owners of Alvion directly and had Howard Skaist, Esq., draft and/or cause to be filed a second law suit (filed in the Middle District of Tennessee - 3:08-cv-00866 Alvion Properties, Inc. et al v. Weber et al, on 09/12/2008) against Defendant Weber and Defendant Chauveau, in an attempt to obstruct Defendant Weber out of the relationship and which has caused tremendous additional costs and damages to Defendants Weber, Chauveau and others.

24. On May 20, 2008, Defendant Weber issued another letter to David Cooper requesting a definition as to exactly what the "IP" was which was alleged to have been violated. The letter received no response.

25. On May 21, 2008, Defendant Chauveau responded affirmatively to the request of Melland to have affidavits issued by Defendant Chauveau and Defendant Weber attesting that their alleged undefined "IP" was not being used. Conditions were stipulated that had to be satisfied by Melland before such affidavits could ever be issued. Melland never responded but instead filed the complaint now pending before this Honourable Court.


## MELLAND GROUP LLC CORPORATE INFORMATION

26. To the best of my knowledge, Melland has its principal place of business at the home address of Mr. Robert West ("West") and not as often falsely represented at 6700 SW Sandburg Road, Tigard, Oregon  97223. As a self-proclaimed company that manages multi-billion dollar transactions, Melland maintains no office of its own. It conducts some of their meetings in Tigard, Oregon, in the office of a food distributor, Western Family Foods, Inc.. Melland is owned by ADLM's wife Elizabeth Melland, even though ADLM often falsely represents he is the sole owner (contradicted by the Oregon Secretary of State Corporate Division). Melland is not licensed in Oregon (or anywhere else in the USA for that matter) to offer or conduct financial services but nevertheless offers "risk free investments" openly to the public.

**ALLAIN DE LA MOTTE**

27. To the best of my knowledge, ADLM is a Mauritian Citizen with permanent residency rights in the USA. According to ADLM he has applied for US citizenship three times and each time the citizenship was denied for undefined reasons. Melland is the alter ego of ADLM, who uses Melland as his very own personal bank account to pay himself, as well for Mr. West, his wife, Elizabeth, and any other parties who from time to time happen to be on his personal payroll. According to ADLM, Melland was created to be an IP holding and licensing company controlled by ADLM and owned by his wife, Elizabeth, which, according to ADLM, is designed to protect his personal IP and to limit his own personal liability in the event that he should ever be deported by the US authorities. Purely and simply put, ADLM and West are extraordinary con artists and prior to Alvion defrauded another company called QTires http://www.qtires.com (and possibly others). In the case of QTires the founding shareholder pledged 1 million shares of privately held stock to collateralize a $300,000 loan but ADLM/Melland defaulted on the loan and was never repaid by ADLM/Melland. That shareholder consequently lost his stock. ADLM signs as the Chairman of Melland. The clever technique used by ADLM to obtain funds from unsuspecting parties to cover alleged "costs" of transactions, which he then systematically misappropriates to fund the filing of his outrageous and unrealizable patent claims and the law firms who represent and defend him, represents a classic upfront advance fee scheme operation, where excuses rather than the promised investment returns are the only things that ever take place.

**THE "PATENTS"**

28. To the best of my knowledge, ADLM and/or Melland do not own a single patent, although this is regularly falsely represented otherwise (e.g. Melland's Corporate Profile). To date none of their patent filings has ever resulted in an actual patent, according to direct information obtained from Mr. David Cooper of Kolisch Hartwell, P.C., 200 Pacific Building, 520 S.W. Yamhill Street, Portland, Oregon 97204, an intellectual property law firm, http://www.khpatent.com, that was used by ADLM and/or Melland until they disappeared from the scene.

**THE "PATTERN WITH LAW FIRMS"**

29. ADLM is a very intelligent salesman, who is gifted at the art of overwhelming even sophisticated parties with his investment and banking terminology jargon and who understands how to cause third parties (e.g. Alvion) to pay enormous upfront consulting fees in favour of Melland. The majority of the work conducted by these law firms is on a contingency basis, where ADLM promises a certain percentage of each transaction to the law firm in exchange for their legal services. However, the transactions never nor have ever taken place. When the law firm finally realizes that there will be no income from the transactions, but rather lots of issues and potential liabilities coming their way due to ADLM's misrepresentations, etc., (Mr. Cooper involuntarily serves as a good example here) and that the law firm will be left "holding the bag" for all their fees, ADLM then moves on to the next law firm, taking with him the work product developed by the previous law firm to the next unsuspecting law firm.

For example:

    i.    from **Cadwalader, Wickersham & Taft LLP**, One World Financial Center, New York, NY 10281,

    ii.    to **Edwards Angell Palmer & Dodge LLP**, 750 Lexington Avenue, New York, NY 10022,

    iii.    to **Seward & Kissel LLP**, One Battery Park Plaza, New York, NY 10004, on

    iv.    to **Law Offices of Stephen R. Field**, 240 Madison Avenue, New York, NY 10016, and further on

    v.    to **Kolisch Hartwell, P.C.**, 200 Pacific Building, 520 S.W. Yamhill Street, Portland, Oregon 97204, and further on

    vi.    to **Berkeley Law and Technology Group, LLP** ("BLTG"), 17933 NW Evergreen Parkway, Suite 250, Beaverton, OR 97006, and further on

    vii.    To **The Coffman Law Firm**, First City Building, 505 Orleans St., Ste. 505, Beaumont, TX 77701, and further on

    viii.    To **The Creekmore Law Firm**, P.C., 52 Pondview Court, Daleville, VA 24083, and further on

    ix.    To **Goodman, Allen & Filetti, PLLC**, 4501 Highwoods Parkway, Ste. 210, Glen Allen, VA 23060, and lately to

    x.    To **Perkins Coie, LLP**, 1120 NW Couch Street, 10th Floor, Portland, OR 97209-4128.

30. Now, ADLM has lured BLTG, The Coffman Law Firm, The Creekmore Law Firm, Goodman, Allen & Filetti, PLLC, and the latest legal counsel Perkins Coie LLP into the same position. These law firms may not yet realize what liabilities they are creating for their respective firm by representing ADLM's unenforceable and illegal IP until it is too late. At such time, ADLM will have moved onwards to the next law firm.

## THE PERSONAL INTEREST OF MR. SKAIST AND MR. KARR IN MELLAND GROUP LLC

31. The engagement of BLTG, Mr. Skaist and Mr. Ted Karr, differs from the above pattern.

32. To my knowledge, Mr. Skaist and Mr. Karr have been on the Senior Management Team of Melland for a long time. Howard A. Skaist is named Chief Patent Counsel and Ted D. Karr is named Chief IP Licensing Counsel. This is an excerpt from the company management bio of Melland as it relates to Messrs. Skaist and Karr:

> "*In their respective capacities as chief patent counsel and Chief IP licensing counsel, Messrs. Skaist and Karr handle all aspects of managing the intellectual property portfolio of the company and nTrust's intellectual property patent trust formed to exploit one of the company's patent portfolio which consists of a process of aggregating and monetizing a diversified portfolio of patents and the investment of proceeds in 100% principal-protected strategies that provide a financial return for the owner of an illiquid patent portfolio asset over and above normal licensing income. In cooperation with the company's long-standing external intellectual property counsel (Kolish Hartwell, LLP), Messrs.*

> *Skaist and Karr are responsible for in-house patent strategy, preparation and prosecution, portfolio building, portfolio management, patent assertion and other patent license negotiation support, including strategic oversight of future patent litigation.*"

33. According to ADLM, BLTG has advanced as much as $3 Million of BLTG's money and/or Howard Skaist's money to file ADLM's patents while ADLM has been unable to refund the firm. On several occasions, ADLM even advised that he and Melland were in the process of acquiring BLTG.

34. Based on these representations, I believe that Messrs. Skaist and Karr have a significant personal interest in Melland which has not been disclosed to the public. To wit, Messrs. Skaist and Karr support, protect and market

> "*an intellectual property patent trust formed to exploit one of the company's patent portfolio which consists of a process of aggregating and monetizing a diversified portfolio of patents*",

while no actual patents exist.

35. Needless to say that even if such trust exists, neither ADLM nor Melland own any patents that such a trust could manage. It is all a big illusion.


**THE ADVANCE FEE SCHEME**

36. The website of the Federal Bureau of Investigation ("FBI") quotes the symptoms of an "Advance Fee Scheme" as follows:

> "*An advance fee scheme occurs when the victim pays money to someone in anticipation of receiving something of greater value, such as a loan, contract, investment, or gift, and then receives little or nothing in return. .... Be wary of business deals that require you to sign nondisclosure or noncircumvention agreements that are designed to prevent you from independently verifying the bona fides of the people with whom you intend to do business. Con artists often use noncircumvention agreements to threaten their victims with civil suit if they report their losses to law enforcement.*"

37. The behaviour of ADLM and/or Melland unfortunately confirms these symptoms. "Nothing of value was returned" as nothing can be returned because the alleged IP cannot be legitimately implemented in the marketplace. No value can be realized because the alleged IP in question is illegal under 12CFR 3.100 (f) (1). Given ADLM's self-professed level of financial subject-matter expertise, ADLM and his law firms must indeed know this. It is in fact the legal obligation of any competent IP lawyer to independently confirm this if litigation is to be pursued. Therefore, one can only reasonably presume that they too must have come to the very same conclusion that the alleged IP is indeed illegal.

38. As confirmed by the FBI, advance fee scheme con artists typically use nondisclosure agreements to threaten their victims with civil suits when they cannot return the advance fees or perform their promises. In this case, with full knowledge that there cannot possibly be any performance due to the illegality of the IP, ADLM and Melland behave in perfect stereotypical fashion as described by the FBI as an "advance fee scheme" and file or cause frivolous law suits to be filed against the parties they have damaged in hope that these parties will simply capitulate to their legal threats, which will then permit them to escape their legal and moral responsibilities.

39. I believe that ADLM must have constructive knowledge of this: "*If one by prudent behaviour should have known a fact, they are deemed having knowledge of that fact.*" In compliance with the legal principle of "constructive knowledge", both ADLM and/or Melland, and just as importantly, the armada of specialized IP lawyers who are legally obligated to independently verify the merits of a client's IP BEFORE a complaint is filed must have had cognizance of the illegality of the IP had they applied a minimum of reasonable care or due diligence. In failing to conduct their legal obligation of due diligence, IP lawyers cannot avoid civil liability in applying wilful blindness by closing their eyes to what is occurring with the alleged proprietary IP of their clients and not take any corrective action. Plaintiffs' IP lawyers deliberately failed to make a reasonable inquiry of wrongdoing despite the awareness of the high probability of the existence of illegality, after they were alerted several times in writing by Defendants of the defects.

40. An advance-fee fraud is a confidence trick in which the target is persuaded to advance sums of money in the hope of realizing a significantly larger gain. This hope will never be fulfilled by ADLM and/or Melland as the underlying premise is illegal.

## THE HEART OF THE "CONFIDENTIAL IP"

41. The heart of the "confidential IP" is the structured combination of standard banking products, e.g. a Certificate of Deposit (CD), strip the interest coupon from the principal note, take the principal note, then borrow 100% against it at a lower interest rate than the coupon rate and thereby create an interest arbitrage (and instant profit). Nobody has ever seen it happening. The key flaw in this "IP" is that the principal note has a present-day value that is significantly lower than 100% and therefore prevents the borrowing of 100% of the future value of the principal note.

> *Product description by Melland Group LLC:*
> *Method of engineering a profitable financial arbitrage through the use of a bank certificate of deposit purchased at a yield to maturity that exceeds its refinancing cost, wherein the CD and the loan mature concurrently, the loan risk is fully defeased (interest and principal) by the pledge of the CD, periodic receivables and payables are matched to provide equal cash flows, and the closing requires a simultaneous closing in escrow of all the components that make up a transaction.*

42. When this didn't work, Melland's focus shifted from a CD to instead purchase notes that qualify as Tier 2 capital for the banks (subordinated and unsecured). It was then discovered by Alvion Partners LLC, AGF and AGF Realty Solutions LLC that OCC and FDIC rules and regulations prohibit a bank to lend against its own qualifying Tier 2 notes. With this prohibition, the alleged IP, referenced as the alleged "ICEF" Program independently developed by me and Mr Chauveau and alleged to be proprietary by the Plaintiffs, becomes unworkable and illegal under 12 CFR 3.100 (f) (1).

43. On the other hand no counterparty bank will lend against the unsecured and subordinated notes at par. The current mortgage and credit crisis has proven what value bank indentures have that do not have recourse in the event of

default. It is therefore fair to say that this "IP" is the attempt to market an illegitimate product and that BLTG (and the derivative law firms) has failed to conclude their due diligence when assisting Melland in marketing or "protecting" their "IP". When David Cooper's law firm was confronted with these facts and realized that there was no basis for this "IP" and that Mr. Cooper and his law firm were exposing themselves to substantial liabilities, the law firm refrained from any other unsubstantiated allegations and abruptly stopped all communications.

## PARTIAL LIST OF MISREPRENSENTATIONS BY ADLM AND/OR MELLAND AND/OR WEST

44. The following represents a <u>partial</u> list of misrepresentations of ADLM and/or Melland, in no particular order:

❖ The representation that ADLM or Melland own patents is false advertisement, misleading and a form of constructive fraud.

❖ The representation that ADLM or Melland had secured an institutional trustee to manage the trusts, alike Deutsche Bank of the Americas, State Street Bank or Bank of New York Mellon, is false.

❖ The representation that ADLM or Melland own proprietary technology that creates "riskless above-market returns" is false.

❖ The representation of computations of income projections is false.

❖ The representation of timelines to return the advanced fees is false.

❖ The representation of timelines to conclude the trust transaction is false.

❖ The representation that ADLM or Melland have direct access to deeply discounted bank notes is false.

❖ The representation that ADLM or Melland have developed or own ICEF is false.

❖ The representation that ADLM or Melland have proven financial resources to monetize illiquid assets is false.

❖ The representation that the trust notes are discountable via the discount window of the Federal Reserve System is false.

❖ The representation that Standard & Poor's would apply a minimum rating of AA to the unit participation trust notes is false.

## THE RELATED LAW SUIT IN THE MIDDLE DISTRICT OF TENNESEE

45. When it became clear to ADLM and Melland that Defendants Weber and Chauveau had discovered that ADLM's alleged IP had no value and when Defendant Weber, then the CFO of Alvion, rescinded all agreements with Melland, it also became obvious to ADLM and/or Melland that they had lost access to the only true value they could present to banks to justify their advance fee scheme: the Alvion assets under legal control of Defendant Weber. Without presenting tangible substantial assets to a banking institution, no sophisticated institution would entertain the wild and unsubstantiated theories of ADLM and his illegitimate IP.

46. As a consequence, and now in survival mode and in his attempt to justify his advance fee scheme, ADLM met without my knowledge or permission with the ex-shareholders of Alvion Properties, Inc., Messrs. Medley and Reynolds in Nashville on or about May 16, 2008. Messrs. Medley and Reynolds are insufficiently sophisticated in financial matters to form an objective opinion on ADLM's unsubstantiated "IP". In accordance with ADLM's Declaration on record with the Honorable Court, Mr. Henshaw of Farmers State Bank, who clearly breached current banking laws by releasing Alvion Partners LLC private information to ADLM and Melland and is aiding and abetting ADLM in his scheme, also participated in the meeting.

47. In this meeting the idea was concocted to file yet another frivolous law suit (ironically staged as a trademark infringement and reverse passing off) in the United States District Court Middle District of Tennessee (case number 3:08-cv-866) against the same defendants (the "TN law suit"). This law suit was also motivated by the fact that Defendant Weber had optioned to transfer the stock from the former share holders Medley and Reynolds to AGF, fully vested with an irrevocable stock power by Attorney Grant, Esq., at such time representing

Messrs. Medley and Reynolds, so that the Alvion assets were suddenly out of reach for ADLM and Melland.

48. Even more ironically, not only does the TN law suit partially contain identical language and phrases as the complaint filed with this Honorable Court (the very same Mr. Howard Skaist of BLTG admitted to Defendant Chauveau that he had drafted both law suits), but also the very same armada of lawyers and law firms are litigating both law suits.

ADLM breached all rules of ethical conduct by interfering with the long-standing relationship Defendant Weber had established with the former Alvion shareholders Medley and Reynolds by convincing the shareholders of Alvion the way he convinced Defendants Weber and Chauveau and others that by using his alleged, unsubstantiated, and now known to be illegal IP that he could generate millions of risk-free profits.

## CONCLUSION

49. In conclusion, ADLM, West and Melland are conducting illegal, deceptive and unethical business practices.

50. None of ADLM's and Melland's claims of

   a. Defendants' alleged misappropriation of Plaintiffs' trade secrets;
   b. Defendants' alleged infringement of Plaintiffs' trademark rights under section 43(a) of the Lanham Act;
   c. Defendants' alleged breach of the non-disclosure agreements ("CNDAs") executed by one or more Defendants, on the one hand, and Melland Group LLC on the other hand; and
   d. Defendants alleged breach of the fiduciary duties owed to Plaintiffs by Defendants,

have any merits whatsoever, for the simple reason that Plaintiffs' alleged Confidential Technology, in particular the "ICEF" Program is illegal under current OCC and FDIC rules and regulations as set forth in 12CFR 3.100 (f) (1).

51. Plaintiffs' allegations that unless and until Defendants are enjoined by this Honorable Court, Plaintiffs would continue to suffer irreparable harm due to Defendants' alleged acts, are therefore utterly meritless as no harm could be suffered by Plaintiffs and no enrichment can ever inure to Plaintiffs or the Defendants. In particular, Plaintiffs' alleged "ICEF" Program proprietary technology is neither confidential, nor proprietary, nor does it contain trade secrets because the technology is illegal and cannot possibly be legally implemented in the financial markets.

52. Even if, for argument purposes only, all the allegations of Plaintiffs in their Complaint would be factually undisputed and taken to be true, the entire premise for Plaintiffs' Complaint is entirely baseless and absurd. If any party should be enjoined from representing the alleged IP, it should be the Plaintiffs and not the Defendants as Defendants have long abandoned the illegal IP.

53. In the alternate, it should be the Plaintiffs who should be disgorged of all advance consulting fees they have been paid or, they should be required by the Honorable Court to demonstrate the legitimacy of their alleged IP – i.e., how Plaintiffs have in fact successfully and legitimately generated the risk-free profits they allege their IP is capable of generating for their clients. The Honorable Court should compel Plaintiffs to either prove the legality of their alleged "IP" (better described as "Imaginary Property" rather than "Intellectual Property"), or enjoin the Plaintiffs to forever cease to conduct business and make any further representations of their alleged IP to the marketplace.

54. If Plaintiffs cannot establish the legality of their IP, then Plaintiffs and their lawyers should also all be sanctioned under FRCP 11(b) for having filed such a ridiculous, frivolous and extremely malicious lawsuit. Plaintiffs' continuation of the lawsuit after discovery of the facts showing absolutely no merits would be tantamount to vexatious litigation.

**WHEREFORE**, Plaintiffs' Motion for Preliminary Injunction and Motion for Expedited Discovery should be **DENIED**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 21, 2008


    Respectfully submitted,



        /s/ Bernd H. Weber

        Bernd H. Weber, Pro Se
        Suite 702
        Email: agfinance@a-g-finance.com
        55 Kingsbridge Garden Circle
        Mississauga, Ontario L5R 1Y1

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the **Declaration of Bernd H. Weber in Opposition of Plaintiffs' Motion for Preliminary Injunction and Plaintiffs' Motion for Expedited Discovery** was filed with the Office of the Clerk of the Court of the United States District Court for the District of Oregon using the CM/ECF system, pursuant to the Local Rules of the District of Oregon on December 30, 2008. (Previous attempts to file the document(s) on December 21, 2008 and December 22, 2008 failed due to weather-related server problems as reported by the Court. Consequently, the Court granted Defendants permission to file the attached no later than December 30, 2008.)

and by electronic transmission to:

Lawrence H. Reichman, OSB No. 860836
LReichman@perkinscoie.com
Nicholle Winters, OSB No. 054155
NWinters@perkinscoie.com
**PERKINS COIE LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
Facsimile: 503.727.2222

Howard Skaist, Esq., OSB No 883482
hskaist@bltg-ip.com
Katherine Ford Horvath, Esq. (admitted pro hac vice)
khorvath@bltg-ip.com
**BERKELEY LAW AND TECHNOLOGY GROUP LLP**
17933 Evergreen Parkway, Suite 250
Beaverton, OR 97006-7660
Telephone: 503.439.6500
Facsimile: 503.439.6558

Richard L. Coffman, Esq. (admitted pro hac vice)
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans St., Ste. 505

Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
rc@cofflaw.com

/s/ Bernd H. Weber
Bernd H. Weber, Pro Se
Suite 702
Email: agfinance@a-g-finance.com
55 Kingsbridge Garden Circle
Mississauga, Ontario L5R 1Y1